IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

LONNIE KADE WELSH,          §
Institutional ID No. 6516607,   §
                            §
            Plaintiff,      §
                            §    CIVIL ACTION NO. 5:22-CV-237-BQ
v.                          §
                            §
MISTY DIAZ, *et al.*,       §
                            §
            Defendants.     §

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Proceeding pro se and *in forma pauperis*, Lonnie Kade Welsh filed this action under 42 U.S.C. § 1983 alleging violations of his constitutional rights while detained at the Lamb County Jail (Jail). Welsh seeks monetary damages for his alleged injuries. Compl. 27–29, ECF No. 1.

Welsh filed his original Complaint on September 19, 2022. ECF No. 1. The United States District Judge transferred this case to the undersigned United States Magistrate Judge. ECF No. 5. The undersigned thereafter granted Welsh's Application to Proceed *in Forma Pauperis* (IFP) (ECF Nos. 8, 9, 10, 11) and reviewed Welsh's Complaint and authenticated records provided by Lamb County. ECF No. 12. The undersigned then ordered Welsh to complete a questionnaire pursuant to *Watson v. Ault*, 525 F.2d 886, 892–93 (5th Cir. 1976), which he timely completed and returned. ECF Nos. 13, 15.

Not all parties have consented to proceed before the undersigned magistrate judge. In accordance with the order of transfer, the undersigned makes the following findings, conclusions, and recommendations to the United States District Judge.

## I.    <u>Standard of Review</u>

Section 1915(e) requires dismissal of an IFP complaint *at any time* if the court determines the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.[1]   28 U.S.C. § 1915(e)(2)(B)(i)–(iii); *see Newsome v. E.E.O.C.*, 301 F.3d 227, 231–33 (5th Cir. 2002) (affirming dismissal of pro se, non-prisoner plaintiff's claims as frivolous and for failure to state a claim under § 1915(e)(2)(B)(i) and (ii)).   A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).   A complaint has no arguable basis in fact if it rests upon clearly baseless factual contentions, and similarly lacks an arguable basis in law if it embraces indisputably meritless legal theories. *See id.* at 327.   When analyzing a pro se plaintiff's complaint, the court may consider reliable evidence such as the plaintiff's allegations, responses to a questionnaire, and authenticated records.   *See Wilson v. Barrientos*, 926 F.2d 480, 483–84 (5th Cir. 1991); *see also Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (noting responses given to a questionnaire are incorporated into the plaintiff's pleadings); *Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (per curiam) (holding that courts may dismiss prisoners' in forma pauperis claims as frivolous based on "medical and other prison records if they are adequately identified or authenticated" (internal quotation marks omitted)).

---

[1] At the time he filed his Complaint and IFP application, Welsh was housed at the Texas Civil Commitment Center (TCCC) under an order and judgment of civil confinement as a sexually violent predator (SVP). Thus, he is not a "prisoner" within the meaning of 28 U.S.C. § 1915(h) and is not subject to the screening provisions of the Prison Litigation Reform Act. Because Welsh sought and was granted leave to proceed IFP, however, he is nevertheless subject to the screening provisions of 28 U.S.C. § 1915(e)(2). In addition, the acts he complains of allegedly occurred during his pretrial detention at a county jail while awaiting trial on pending state criminal charges. The Court therefore evaluates his claims under the constitutional standards applicable to pretrial detainees, to the extent they deviate from constitutional principles applicable to those civilly committed.

In evaluating the sufficiency of a complaint, courts accept well-pleaded factual allegations as true, but do not credit conclusory allegations or assertions that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016) (per curiam). And while courts hold pro se plaintiffs to a more lenient standard than lawyers when analyzing complaints, such plaintiffs must nevertheless plead factual allegations that raise the right to relief above a speculative level. *Id.* (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)).

## II.    Discussion

### A. Welsh's Claims

Welsh asserts claims against the following Defendants:  (1) Lamb County; (2) Lamb County Sheriff Gary Maddox; (3) Jail Administrator Misty Diaz; (4) Chief Deputy Craig Thompson; (5) Deputy Chris Weston; (6) Deputy Michael Armstrong; (7) Deputy Becky Cotton; (8) Deputy M. Garza; (9) Jailer Alex Martinez; (10) Jailer Leandra Molina; (11) Jailer Robert Fultz; (12) Jailer Whitaker; (13) Management and Training Corporation (MTC) Employee James Winckler; (14) MTC Employee James Powell; (15) Prodigy Services; (16) Sterling Corporation; and (17) Deputy Barbra Klatt.  Compl. 1–3, 9–10, 14–15.  Welsh sues Sheriff Maddox in his individual and official capacities; all others are sued solely in their individual capacity.  *Id.* at 1–3.

Welsh asserts that on September 16, 2020, he submitted a book order request and the next day, Administrator Diaz denied the request.  *Id.* at 3.  Diaz allegedly told Welsh "outside vendor books are not allowed."  *Id.*  Sheriff "Maddox [subsequently] made clear through the grievance system that it is" the Jail's policy to deny book orders and stated "that it was his personal policy to deny any and all books regardless of content."  *Id.*  Welsh contends he informed Sheriff Maddox

3

that this violated his First Amendment rights and Maddox "affirmed the denial" and would not approve any book orders from September 15, 2020, to November 5, 2021. *Id.* at 3–4. Welsh, however, was allowed to access the law library and order a dictionary through the commissary during this time. Questionnaire 1–2, ECF No. 15.

In addition, on September 13, 2021, Welsh allegedly received only one of six legal newsletters he ordered. Compl. 4. Welsh called the publisher and was told that all six newsletters were sent beginning in March 2021, and one should have arrived each month. *Id.*; Questionnaire 3. Sheriff Maddox, however, purportedly told Welsh that the newsletters were considered contraband, until a change in policy went into effect roughly eight months later, i.e., on November 5, 2021. Compl. 4; Questionnaire 3. Welsh avers he never received the other newsletters due to this policy. Compl. 4. He asserts this caused him "sever[e] depression, anxiety, and sleepless nights due to worrying, depressive state of mind, and fear produced by the anxiety." *Id.*

Next, Welsh contends that "Lamb County denies all recreation equipment except a small rubber ball and [only] allow[s] 3 hours of recreation each week with no direct sunlight." *Id.* According to Welsh, this "policy is an exaggerated response to security concerns" and is implemented with "an intent to punish," as illustrated by the Texas Department of Criminal Justice's (TDCJ) apparently more relaxed policies. *Id.*; Questionnaire 5. Because Welsh does not have his desired workout equipment, he "placed his approved legal papers" in an "approved property box and used them to exercise." Compl. 5. Welsh alleges Deputy Weston then "threaten[ed] to take all [his] property and classify it as contraband" because Welsh was using the papers outside their prescribed use. *Id.*; Questionnaire 5. Welsh asserts Weston's threats violated the Fourteenth Amendment because "[i]t chilled [Welsh's] ability to work [his] body," resulting in Welsh being depressed and losing muscle mass. Compl. 5–6; Questionnaire 5–6. Similarly,

Welsh alleges that the Jail's policy of only providing one uniform that is laundered twice a week prevents him from "working out a sweat." Compl. 5. He contends this violates his Eighth and Fourteenth Amendment rights "to . . . exercise[,] therefore punishing [Welsh]." Questionnaire 6.

On October 6, 2020, Welsh alleges Deputy Garza came to his cell with a form asking Welsh to waive disciplinary proceedings and accept reduced sanctions. Compl. 6. Welsh requested information regarding the factual allegations and charge against him, but Garza "refused to give him any information other than the title of the rule violation." *Id.* Welsh attended a disciplinary hearing on October 13, 2020, during which he "protested that he did not receive notice of the statements made against him, the complaining" officer's name, or any factual allegations. *Id.* Welsh contends that after he was returned to his cell, Deputy Garza appeared with another waiver, again sans any specific information. *Id.* Deputy Garza purportedly informed Welsh that if he did not sign the waiver an additional hearing would be held, and Welsh would not be given notice of the factual allegations or be able to present a defense or witnesses in his favor, and that any sanctions imposed would be significantly worse. *Id.* at 6–7. Welsh then "sign[ed] the waiver under duress." *Id.* at 7. Authenticated records show that on October 5, 2020, Welsh began yelling obscenities and threw his food tray at the cell door and ceiling multiple times, resulting in damage to the food tray and Welsh being charged with destruction of property, throwing/propelling objects, and interference with security operations. Questionnaire 7. Welsh denies yelling obscenities and damaging the food tray but otherwise does not dispute these events.[2] *Id.* Records also show, and Welsh again does not specifically deny, that the disciplinary hearing on October 13 was cut short

---

[2] In the Court's questionnaire, the events as described in the authenticated records were reiterated to Welsh, and he was asked whether he agreed, and if not, to explain why he disagreed. Questionnaire 7. In question 4.a., the incident forming the basis of the disciplinary charges against Welsh was described, and Welsh's only explicit denials were that he "did no damage to the food tray" because it "could still be used," and he "also did not yell obscenities." *Id.* Because Welsh does not otherwise dispute the described events, the undersigned accepts as true that he threw the food tray multiple times (but did not damage it) and was charged with multiple disciplinary infractions as a result.

because Welsh became upset and stated that he had wanted to sign the waiver form when Garza originally presented it on October 6.[3] *Id.* After Welsh signed the waiver form, he was given fifteen days of restrictions beginning on October 13. *Id.*

While Welsh agrees he was on restriction, he takes issue with Administrator Diaz's confiscation of property on October 14, 2020, because (1) he purchased it on October 12, the day before his restriction began, and (2) the "confiscation was separate from the actual commissary restriction imposed." Compl. 7. Welsh explains that a "commissary restriction is the ability to purchase commissary" rather than the ability to possess it, and because Welsh bought the items before his restrictions were imposed, Diaz "retroactively" punished him. Questionnaire 9. Welsh avers this sanction was made without procedural due process and denied him of his right to possess his personal property from October 14 to October 29. *Id.*; Compl. 7. Records show, and Welsh agrees, that Welsh submitted a grievance after his property was taken and Jail personnel informed him that his restriction "mean[t] 15 days loss of commissary" and the property would "be available to [him] once [he] finish[ed] [his] disciplinary sanctions." Questionnaire 9.

Welsh also brings a claim against Lamb County under the Fourteenth Amendment, alleging that Sheriff Maddox does not have authority to "impose sanctions or promulgate rules for the jail administrations and function." *Id.* at 10; Compl. 7–8. In Welsh's view, Lamb County violates the Texas Constitution's separation of powers provision through Sheriff Maddox's conduct, in that it

---

[3] As in the events described in note 2 *supra*, the Court's questionnaire specifically asked Welsh about what allegedly happened during his disciplinary hearing, as described in the authenticated records. Questionnaire 7. Welsh disputes that he threw a chair ("I sat the chair down and it fell over"), and in reference to the records stating that he became upset because he told Garza he wanted to sign the waiver form on October 6, he does not deny this statement and explains he "was *also* upset by" matters related to the October 13 hearing, e.g., not knowing the charges, not having the statements made against him, etc. *Id.* (emphasis added). Because Welsh does not directly dispute the fact that he was upset during his disciplinary hearing in part because he was not allowed to sign the disciplinary form earlier, the undersigned accepts it as true.

is not a legislative body or the judiciary and thus cannot enact rules or impose punishment. Questionnaire 10.

On October 21, 2020, Welsh requested internet access so that he could "express his voice" in the Texas Supreme Court election. Compl. 11. Welsh asserts he had no other means to participate but the Jail has an "arbitrary and purposeless" restriction that prevented him from doing so. *Id.* According to Welsh, the internet is a public forum and the Jail's "prohibition sweeps to[o] broadly." Questionnaire 12. Welsh contends its goals "could be achieved by simple programming to prevent access to websites . . . , similar to the book restrictions and software . . . used to monitor what is being said." *Id.* He also explains that a content-based or time, place, and manner restriction would be more appropriate. *Id.* Welsh agrees that he submitted a grievance regarding this policy and was denied any relief, but after he appealed, he "refused to attend [his hearing] so the board denied the appeal." *Id.* In Welsh's view, refusal to provide him with internet access violated his First Amendment and Fourteenth Amendment rights because he was "[p]unished by thought control, did not receive the process that was due, and [was] censor[ed]." *Id.* at 12–13.

Welsh brings similar claims under the First and Fourteenth Amendments based on the Jail's switch from a cable system that provided fifty channels to one that "only provide[s] access to 4 channels." Compl. 12. He contends the Sheriff and Jail "intentional[ly] blocked 58 other channels" to punish detainees and failed to "provide any procedural process" before doing so. *Id.* Welsh asserts this constitutes "a prior restraint upon the enjoyment of first amendment activities . . . without even the ability to speak upon the appropriateness of the channel itself." *Id.* at 13. Welsh also contends there is a "blanket ban" on the radio and the "Jail has no ability to access the content the radio provides." *Id.*; Questionnaire 15. According to Welsh, TDCJ allows radios and thus the "Jail policy restricting radios is an over exaggerated response to any security concerns and

is intended to punish." Compl. 13. Welsh alleges the same with respect to video games. *Id.* at 13–14. He contends he has a First Amendment right to both the radio and video games. *Id.*

In addition, Welsh alleges that the Jail "inflate[s] and price gauge[s] [sic] Welsh at a rate of twenty cents a minute and has . . . a monopoly over the phone services." *Id.* at 14. Because of this, "Welsh was forced to [borrow] . . . $1,600 . . . to communicate" and "exercise his First Amendment associative rights." *Id.* at 15. These rates are allegedly "set to punish by increasing the burden upon Welsh to exercise" these rights. *Id.* Welsh avers the Jail, the phone provider (Sterling), and the commissary provider (Prodigy Services), "conspire to price gauge [sic] him . . . so they can profit share under their agreed contract." *Id.*; Questionnaire 27. He contends Lamb County accomplishes this by "exclud[ing] by contract any outside competitor" and choosing "the one provider that mark-up [sic] the prices." Questionnaire 27. Welsh brings this claim under the Sherman Act. *Id.* at 28.

On January 12, 2021, Welsh alleges that Jail personnel came to his cell to bring him to a medical appointment at University Medical Center (UMC), but Welsh refused. Compl. 8–9. He contends that Administrator Diaz then authorized the use of force if he did not agree to go, and Deputy Armstrong said he "did not have a choice," which Welsh perceived as a threat. *Id.* at 8–9. Welsh then went with officers "[u]nder duress" and was put in restraints by Deputies Armstrong and Klatt. *Id.* at 9. Welsh avers this denied him his right to refuse medical treatment under the Fourteenth Amendment. *Id.*; Questionnaire 11. He likewise alleges this claim against Lamb County, asserting that it is the county's "policy not to allow an individual to refuse to go to a medical appointment," and such policy is implemented by Sheriff Maddox. Questionnaire 11. Welsh alleges that being in full restraints while waiting approximately two hours for his

appointment caused him pain and scarred his wrists. Compl. 10. Welsh also claims that during this time, he was not allowed to use the restroom, "caus[ing] [him] pain and mental torture."[4] *Id.*

Welsh asserts that on February 12, 2021, he told Administrator Diaz that he needed mental health treatment, and she scheduled an appointment for him with the Central Plains Center (CPC). *Id.* at 23. At Welsh's appointment, however, CPC "informed Welsh that they do not treat his type of mental illness." *Id.* Welsh relayed this to Diaz, but she allegedly "refused to schedule an alternative provider . . . [and] continued to" schedule appointments at CPC. *Id.* Welsh wrote a letter to Sheriff Maddox about the issue. *Id.* He claims that "Diaz and Maddox [then] informed [him] that since . . . his mental disease only caused him to be a danger to others they are not required to give him treatment." *Id.* But according to Welsh, even though he was detained at the Lamb County Jail rather than TCCC, he "still ha[s] the behavioral abnormality that requires treatment."[5] Questionnaire 26. Welsh alleges he continued to request treatment and became depressed and suicidal without such treatment. Compl. 23.

---

[4] To the extent Welsh intends to bring a claim against Deputies Armstrong and Klatt for denying him access to a restroom, the undersigned recommends dismissal as frivolous. Authenticated records, including audio and video records that Welsh does not challenge, show that when Welsh arrived for his 8:30 a.m. appointment, there was a two-hour delay. Questionnaire 11. Deputies Armstrong and Klatt were told to wait until UMC opened at 10:00 a.m.; however, they allowed Welsh to use the restroom at that point. *Id.* Thus, Welsh cannot state a viable claim based on denial of the use of a restroom.

[5] In prior cases, Welsh has claimed that under Texas Health and Safety Code Chapter 841, he is entitled to continued sex offender treatment while being held in a correctional facility, rather than the TCCC. *See e.g., Welsh v. Collier*, No. 1:20-cv-00337-RP, ECF No. 1, at 5 (W.D. Tex. Mar. 30, 2020) (alleging that the prison should have provided him with treatment under § 841.0821, because he has a liberty interest in such treatment based on his status as an SVP). Here, Welsh acknowledges that while detained at the Jail, treatment he normally receives at the civil commitment center "is suspended . . . by statute." Questionnaire 26 (citing TEX. HEALTH & SAFETY CODE § 841.150 (suspending all "duties imposed . . . by this chapter . . . for the duration of a detention or confinement of a committed person in a correctional facility")). Although Welsh generally asserts that he still has a mental illness and deserves treatment (Compl. 22–23; Questionnaire 25–26), he makes no constitutional challenge to § 841.150 and alleges no specific claim as to any right for continued sex offender treatment to continue advancing in the TCCC's tier system— he simply avers that as a result of not receiving treatment he was depressed and suicidal. Compl. 23. As such, the Court construes Welsh's allegations as asserting that Defendants denied him adequate medical care—not that his due process rights were violated by the purported lack of sex offender treatment.

Welsh claims the Jail conditions are "intended to prevent continuous sleep." *Id.* at 15. He first takes issue with a policy requiring Jail officers to "conduct visual checks every thirty minutes." *Id.* at 16. According to Welsh, he has "a right to continuous sleep for at least 4 hours if not 6" under the Fourteenth Amendment. Questionnaire 18. Welsh maintains that under the Jail's rules, the lights are on from 10:00 p.m. to 4:00 a.m., the dayroom does not close until 11:00 p.m., and "[t]he noise level is constant" from 4:00 a.m. until 11:00 p.m. or 12:00 a.m. Compl. 16. The Jail also allegedly requires detainees to "clean the cell area between" 4:00 and 5:00 a.m., which in combination with the light policy and visual checks, "has a mutually enforcing effect . . . to deny sleep." *Id.* He asserts that these policies allow him to receive no "more than 30 min[utes] of sleep at one time without being woken." Questionnaire 18.

On January 11, 2022, Welsh avers Jailer Whitaker took Welsh's inmate trust fund account information and hid it. Compl. 17. Ty Rojas purportedly found the information "hidden in a[n] unused box in the central control area." *Id.* Welsh wrote a letter to the inmate account trust fund manager advising her that "the Seventh Court of Appeals in Amarillo disapprove[s] [of the] way she is conducting the inmate trust fund information." *Id.* Welsh claims Jailers Fultz and Molina "both assured [him]" that they "personally saw" Jailer Whitaker "take the legal letter to Thompson," but that the mail was later discovered hidden with other papers. *Id.* Welsh also contends that after this, Jailers Whitaker, Molina, and Fultz (collectively, Jailers) intentionally made noise during routine checks "in order to harass" him. *Id.* at 18. Welsh alleges that because he complained about his legal mail not being delivered, they "slam[med] the window door aggressively loud when they saw [he] was sleeping." Questionnaire 19. Welsh alleges Jailers also harassed him by delaying his meals "until [they were] cold," and Jailer Whitaker apparently said Welsh was "lucky" he gets to eat at all considering how much he complains about his legal mail.

*Id.* at 19–20; Compl. 18.    Jailers also purportedly "inform[ed] Welsh at various times the harassment [was] because of Welsh filing grievances and complaining" to their supervisors. Compl. 18. The Jail allegedly allowed this harassment and retaliation to continue despite Welsh's grievances informing supervisors Diaz and Maddox of the situation on multiple occasions. Questionnaire 19.

On January 27, 2022, Welsh claims "Lamb County took all of [his] electronic e-mails and recorded text messages sent through the KIOSK machine." Compl. 18. Welsh contends he was not provided notice or a hearing, and Lamb County refused to provide hard copies of his mail. *Id.* Welsh informed Diaz and Maddox, and they apparently "determined that Welsh [does] not have a right to a hard copy." *Id.* at 19. Welsh asserts this violated his procedural due process rights because he has a "right to argue [his] entitlement to the messages." Questionnaire 21. He also avers this "denied [him his] substantive property rights" because Welsh's mail is personal property. *Id.*

On March 4, 2022, Welsh alleges he was released from the Jail because all pending charges were dropped. Compl. 20. Welsh was released back to the TCCC and escorted by MTC employees Winckler and Powell. *Id.* Winckler told Welsh he had to be cuffed during the escort, despite Welsh informing him of "Texas Health and Safety Code [Section] 841.0838 that" only permits the use of hand restraints if "Welsh is a physical threat and it is necessary to prevent imminent injury." *Id.* Deputy Weston then apparently told Welsh he would cuff him. *Id.* at 21. Welsh stood up and, in response, "Weston shoved Welsh down." *Id.* "Welsh then stood back up," and "Thompson and Weston took Welsh to the ground." *Id.* Welsh asserts Thompson then put him in a choke hold and Weston bent Welsh's arms, causing Welsh: pain; bruising on his neck and soreness in his arms for weeks; open wounds around his wrists from the restraints; agitation of his "bilateral

neuropathy," resulting in loss of feeling in his hands for weeks; depression; loss of sleep; and anxiety. *Id.*; Questionnaire 23. During the use of force, Welsh contends Jailer Martinez "secured his legs and stood by[] with Winckler and Powell as Thompson and Weston assaulted Welsh." Compl. 22. Winckler purportedly told Welsh he was being restrained "because of his past assaultive behavior"; specifically, "the criminal case [Welsh was] being discharged for." *Id.*

According to Welsh, both the act of placing him in cuffs, and subsequently putting him in a chokehold and forcing him to the ground, constituted excessive force. Questionnaire 22. Welsh explains Winckler, Powell, and Martinez also allowed the excessive force because Winckler and Powell "solicited" it and "[a]ll three were present during the entire use of restraints," but "never even spoke up to try and verbally stop the use of restraints." *Id.* at 23–24. In Welsh's view, the use of force also denied him his state created liberty interest because restraints cannot be applied to Welsh unless their use falls under the dictates of § 841.0838, which here it allegedly did not. *Id.* at 23. Welsh also asserts that he wrote a letter to Sheriff Maddox afterwards, and he "deliberately ignored" it by stating that there was "no violation of rights." *Id.* at 25; Compl. 22.

Liberally construing his allegations, Welsh appears to assert claims against: (1) Sheriff Maddox, Administrator Diaz, and Lamb County under the First and Fourteenth Amendments for denying him requested books and newsletters and subsequently failing to notify Welsh when ordered publications were rejected; (2) Lamb County, Deputy Weston, Administrator Diaz, and Sheriff Maddox under the Fourteenth Amendment for preventing Welsh from exercising; (3) Deputy Garza under the Fourteenth Amendment for forcing Welsh to sign a disciplinary hearing waiver form, and denying him his right to notice of the factual allegations against him and a hearing; (4) Administrator Diaz under the Fourteenth Amendment for confiscating commissary purchases before his restriction began; (5) Lamb County under the First and Fourteenth

Amendments for denying him internet access so he could express his opinion in the Texas Supreme Court election; (6) Lamb County and Sheriff Maddox under the First and Fourteenth Amendments for switching the cable system and denying him radio programming and video games; (7) Lamb County and Sheriff Maddox under the Fourteenth Amendment and Texas Constitution for promulgating rules and punishing Welsh without legislative or judicial authority; (8) Lamb County, Sterling Corporation, and Prodigy Services under the Sherman Act for conspiring to inflate commissary and phone rate prices; (9) Lamb County, Administrator Diaz, Deputy Armstrong, Sheriff Maddox, Deputy Klatt, and Deputy Cotton under the Fourteenth Amendment for denying him his right to refuse medical treatment and using excessive force; (10) Administrator Diaz and Sheriff Maddox under the Fourteenth Amendment for denying him mental health treatment; (11) Lamb County under the Fourteenth Amendment for preventing Welsh from sleeping; (12) Jailers Whitaker, Molina, and Fultz under the First and Fourteenth Amendments for retaliating against Welsh for filing grievances against Whitaker; (13) Lamb County, Sheriff Maddox, and Administrator Diaz under the Fourteenth Amendment for denying Welsh access to his mail and the opportunity to show entitlement to his mail; (14) Deputies Weston and Thompson under the Fourteenth Amendment for excessive use of force; (15) Jailer Martinez and MTC employees Winckler and Powell under the Fourteenth Amendment for failure to intervene during the use of force; (16) Deputy Weston, Deputy Thompson, Deputy Klatt, Deputy Cotton, Deputy Armstrong, Jailer Martinez, Sheriff Maddox, MTC Employee Winckler, MTC Employee Powell, Lamb County, and Administrator Diaz under the Fourteenth Amendment for denying Welsh his liberty interest in not having restraints used against him; and (17) Lamb County for its "high" phone prices, which chill his First Amendment rights. Compl. 24–27.

### B. Official Capacity Claims Against Sheriff Maddox

Welsh sues Sheriff Maddox in both his individual and official capacities. *Id.* at 1. Welsh, however, also sues Lamb County and names Sheriff Maddox as its official policymaker. *Id.* "[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Olibas v. Gomez*, 481 F. Supp. 2d 721, 724 (W.D. Tex. 2006) (quoting *Turner v. Houma Mun. Fire & Police Civ. Serv. Bd.*, 229 F.3d 478, 484 (5th Cir. 2000)). Thus, Welsh's claims against Sheriff Maddox in his official capacity are essentially claims against Lamb County and should be dismissed to prevent redundancy. *See, e.g., Sanders-Burns v. City of Plano*, 594 F.3d 366, 373 (5th Cir. 2010) (observing that any claims against the city "would render any official capacity claim against [officer] redundant"); *Goad v. Lyde*, No. 7:23-cv-00063-O, 2024 WL 1078225, at *3 (N.D. Tex. Mar. 12, 2024) (dismissing official capacity claims against sheriff as redundant of claims against the county).

Because any official capacity claim against Sheriff Maddox for money damages would as a matter of law be a claim against Lamb County, the undersigned recommends the district judge dismiss Welsh's claims against Sheriff Maddox in his official capacity.[6] Welsh's claims against Sheriff Maddox in his individual capacity (*see infra* Sections II.C., II.D., II.E., II.F., and II.H.), and his policy claims against Lamb County, are addressed below. *See infra* Section II.I.

### C. First Amendment Claims

Welsh asserts that his First Amendment rights were violated by: (1) Sheriff Maddox, Administrator Diaz, and Lamb County because they denied him the ability to order books and

---

[6] Welsh sues Sheriff "Maddox in his official capacity as policy maker for Lamb County"; however, Welsh does not specify which claims against Sheriff Maddox are in his official versus individual capacities. Compl. 1. Thus, the undersigned recommends that any official capacity claim against Sheriff Maddox be dismissed because any potential official capacity claims are addressed by the undersigned's examination of policy claims against Lamb County. *See infra* Section II.I.

other publications; (2) Lamb County when it did not provide Welsh with internet access to voice his opinion in the Texas Supreme Court election; (3) Lamb County and Sheriff Maddox for switching the cable system and denying him radio and video games; (4) Lamb County because it conspired to inflate the phone prices; and (5) Jailers Molina, Fultz, and Whitaker for retaliating against Welsh after he filed grievances against Whitaker.[7] Compl. 3–4, 11–15, 17–18.

"The First Amendment rights afforded pretrial detainees are the same as those afforded convicted inmates." *Oladipupo v. Austin*, 104 F. Supp. 2d 626, 639 (W.D. La. 2000) (citation omitted). Although prisoners do not lose all constitutional protection as a result of their confinement, their rights, including those under the First Amendment, are necessarily more limited in scope than those in the free world. *See Shaw v. Murphy*, 532 U.S. 223, 229 (2001) (maintaining "that the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large"); *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (referencing "the familiar proposition that [l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system" (internal quotation marks and citation omitted)). "In the First Amendment context," a prisoner "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell*, 417 U.S. at 822.

"Whether a prison regulation impermissibly encroaches upon a prisoner's First Amendment rights depends upon whether it is 'reasonably related to legitimate penological interests.'" *Butts v. Martin*, 877 F.3d 571, 584 (5th Cir. 2017) (quoting *Mayfield v. Tex. Dep't of Crim. Just.*, 529 U.S. 599, 607 (5th Cir. 2008)). Courts should consider the four factors identified

---

[7] All of Welsh's First Amendment claims—except for the retaliation claim—are also asserted as policy claims against Lamb County, which are discussed *infra* Section II.I.

by the Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987) in determining the reasonableness

of a prison regulation that allegedly impinges on a prisoner's constitutional rights:

> (1) whether a "valid, rational connection [exists] between the prison regulation and
> the legitimate governmental interest put forward to justify it," (2) whether there
> exist "alternative means of exercising the fundamental right that remain open to
> prison inmates," (3) what "impact accommodation of the asserted constitutional
> right will have on guards and other inmates, and on the allocation of prison
> resources generally," and (4) whether there is an "absence of ready alternatives" to
> the regulation in question.

*Adkins v. Kaspar*, 393 F.3d 559, 564 (5th Cir. 2004) (quoting *Turner*, 482 U.S. at 89–90).  The

Fifth Circuit has held that *Turner*'s first factor—rationality—is the controlling question, while the

remaining factors merely help a court determine whether the connection between the prison

regulation and the governmental interest is logical.  *See Prison Legal News v. Livingston*, 683 F.3d

201, 214–15 (5th Cir. 2012); *Scott v. Miss. Dep't of Corr.*, 961 F.2d 77, 81 (5th Cir. 1992). "The

inmate has the burden of demonstrating that there is no rational relation to a legitimate penological

interest." *Keys v. Torres*, 737 F. App'x 717, 719 (5th Cir. 2018) (per curiam).

"The Supreme Court has also instructed that it is 'important to inquire whether prison

regulations restricting inmates' First Amendment rights operate[] in a neutral fashion.'" *Prison

Legal News*, 683 F.3d at 215 (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989)).  That is,

"the regulation or practice in question must further an important or substantial governmental

interest unrelated to the suppression of expression." *Id.* (quoting *Thornburgh*, 490 U.S. at 415).

"Prison regulations that 'draw distinctions between publications solely on the basis of their

potential implications for prison security' are facially neutral in the relevant sense." *Id.* (quoting

*Thornburgh*, 490 U.S. at 415–16).

### 1. *Books and Newsletters*

Welsh contends Lamb County,[8] Sheriff Maddox, and Administrator Diaz violated his First Amendment rights by denying him the ability to order outside publications.

Welsh asserts that on September 16, 2020, he requested a book be ordered and the next day, Administrator Diaz denied that request. Compl. 3. Diaz allegedly told Welsh that "outside vendor books are not allowed." *Id.* Welsh claims Sheriff "Maddox made clear through the grievance system that it is" the Jail's policy to deny book orders and stated "that it was his personal policy to deny any and all books regardless of content." *Id.* Sheriff Maddox purportedly did not apply this policy to all inmates, and Welsh was apparently prevented from ordering books because he was designated at a different custody level. *See* Questionnaire 2 (alleging other inmates were allowed to order books and that Welsh was separated from population).[9] Welsh also posits that the policy had nothing to do with content because the library had "books of similar genre that [he] had requested"; rather, the policy limited his ability to actually order books. *Id.* He contends he made Sheriff Maddox aware that this violated his First Amendment rights and Maddox "affirmed the denial" and would not approve any book orders from September 15, 2020, to November 5, 2021. Compl. 3–4. Welsh, however, was allowed access to a law library and ordered a dictionary through the commissary during this time. Questionnaire 1–2.

---

[8] For the sake of clarity, the undersigned identifies in this section all First Amendment claims asserted against all Defendants, including Lamb County; however, to the extent Lamb County's liability turns on analysis under *Monell*, its First Amendment culpability is discussed *infra* in Sections II.I.1 & 2.

[9] These assertions could arguably be construed as an equal protection claim based on the purported denial of the ability to order books because of Welsh's custody status. Welsh, however, asserts this in isolation without any supporting facts—i.e., identifying a protected class or other detainees who were treated differently despite being similarly situated to Welsh. Thus, the undersigned declines to consider any possible claim under the Equal Protection Clause for denying Welsh the ability to order books based on his custody status. *See Crull v. City of New Braunfels*, No. SA-06-CA-0772 OG (NN), 2007 WL 667161, at *2 (W.D. Tex. Feb. 27, 2007) (recommending dismissal of plaintiff's equal protection claim because plaintiff pleaded "no facts" and there was "no basis" for analyzing such a claim), *aff'd*, 267 F. App'x 338 (5th Cir. 2008) (per curiam).

On September 13, 2021, Welsh received only one of six legal newsletters he ordered. Compl. 4. Welsh called the publisher and was told that all six newsletters were sent beginning in March 2021, with one to arrive each month. *Id.*; Questionnaire 3. Sheriff Maddox denied confiscating the newsletters but purportedly told Welsh that they were considered contraband until a change in policy on November 5, 2021. Compl. 4; Questionnaire 3. Welsh avers he never received the other newsletters due to this policy. Compl. 4. He asserts this caused him "sever[e] depression, anxiety, and sleepless nights due to worrying, depressive state of mind, and fear produced by the anxiety." *Id.*

Welsh has pursued a similar claim in another case that is still pending. *See Welsh v. Lamb Cnty.*, No. 5:20-cv-00024-H, ECF No. 30, at 27–28 (N.D. Tex. Sept. 24, 2021) (ordering Defendants Diaz, Maddox, Lamb County, and Thompson to answer as to Welsh's claim that the Jail has a policy of restricting inmates' ability to order books). Welsh's claims in case number 5:20-cv-024 arise from when Welsh was detained in the Jail for different criminal charges in late 2017 to 2018. *See id.* at ECF No. 1. Welsh's claims here, however, arise from late 2020 to early 2021. *See* Compl. 3–4. Welsh appears to allege that his First Amendment rights are still being violated by the *same* policy. Questionnaire 2–4 (averring Maddox changed the policy on November 5, 2021, from a blanket ban on all outside books to a policy "allow[ing] vendor order of soft cover books that did not have content of weapon making, escape, or criminal activity"); Compl. 4 (complaining of the time period from September 15, 2020, to November 5, 2021, before the policy change). Thus, the undersigned must consider whether Welsh's claims against Diaz and Maddox are barred by claim preclusion.

As an affirmative defense, res judicata must generally be pleaded by the defendant. *See* FED. R. CIV. P. 8(c)(1). Here, the Court is still conducting § 1915 screening and has ordered no

18

defendant to answer Welsh's claims.  Nevertheless, a court may sua sponte raise res judicata, including during the screening process. *See Welsh v. Lamb Cnty.*, No. 22-10311, 2024 WL 81580, at *2 n.10 (5th Cir. Jan. 8, 2024) (per curiam) (citing *Ali v. Higgs*, 892 F.2d 438, 440 (5th Cir. 1990)); *Omran v. Wyche*, No. 17-cv-0064, 2017 WL 6627410, at *2 (W.D. La. Apr. 5, 2017) (raising res judicata sua sponte during screening because "[t]he court's invocation of the defense . . . serve[d] the interest of judicial economy and avoid[ed] additional burdens on the" parties and the court "that would be imposed if this new complaint were to be served and litigated further"), *aff'd*, 745 F. App'x 225 (5th Cir. 2018) (per curiam).

Both Welsh's current action and his prior case were brought before the United States District Court for the Northern District of Texas in the Lubbock Division.  Further, the undersigned issued Findings, Conclusions, and Recommendations (FCR) in 5:20-cv-024, recommending in part that this claim be dismissed. *See Welsh v. Lamb Cnty.*, No. 5:20-cv-00024-H, ECF Nos. 22, 30.  Thereafter, Welsh objected to the FCR, and sought leave to supplement his allegations as to the book policy claim, which the district judge granted when adopting in part the FCR. *Id.* at ECF Nos. 25, 30.  Based on Welsh's new allegations, the district judge concluded that Welsh had stated a claim. *Id.* at ECF No. 30, at 26–28.

While a court may raise the issue of res judicata on its own volition (*Omran*, 745 F. App'x at 227 (affirming district court's sua sponte dismissal of complaint based on res judicata); *see Ali*, 892 F.2d at 440 ("[I]n an action proceeding under section 1915(d), [the court] may consider, sua sponte, affirmative defenses that are apparent from the record even where they have not been addressed or raised.")), at this juncture, traditional res judicata does not bar Welsh's claims against Administrator Diaz and Sheriff Maddox.  Welsh's First Amendment claim based on the purported denial of books under the Jail's policy remains pending in case number 5:20-cv-024 due to the

subsequent amendment of his pleadings. *See Welsh v. Lamb Cnty.*, No. 5:20-cv-00024-H, ECF No. 93 (denying defendants summary judgment as to Welsh's book policy claim). Because the Court has not entered final judgment in that case, the undersigned considers whether Welsh's claims are foreclosed under the modified claim splitting test.

"Claim-splitting occurs when a single 'cause of action' is split by advancing one part in an initial suit and another part in a later suit." *Ameritox, Ltd. v. Aegis Scis. Corp.*, No. 3:08-CV-1168-D, 2009 WL 305874, at *4 (N.D. Tex. Feb. 9, 2009) (quoting *F.D.I.C. v. Nelson*, No. 93-1590, 1994 WL 93409, at *2 n.5 (5th Cir. Mar. 15, 1994)). It is essentially traditional res judicata or claim preclusion, without the requirements that a final judgment be entered on the merits by a court of competent jurisdiction. *See Armadillo Hotel Grp., L.L.C. v. Harris*, 84 F.4th 623, 628 (5th Cir. 2023) ("Th[e] [res judicata] test is modified when the prior suit is pending because, by definition, no final judgment from the prior suit exists." (citation omitted)). "Accordingly, in the context of claim splitting when an earlier suit is pending, the relevant *res judicata* factors are (1) whether the parties are the same or in privity, and [(2)] whether the same claim . . . is involved in both suits."[10] *Id.* (citation and internal quotation marks omitted).

In both cases, Welsh brought claims against Diaz and Maddox in their individual capacity. Compl. 1–2; *Welsh v. Lamb Cnty.*, No. 5:20-cv-00024-H, Am. Compl. 2, ECF No. 8. Thus, the first element for application of claim splitting—identical parties—is met. *Hamilton Grp., Inc. v. Welch*, No. 3:96-CV-2950-R, 1997 WL 560775, at *4 (N.D. Tex. Sept. 2, 1997) (Res judicata "requires that the claim must have been against an opposing party in the same capacity."); *cf. Johnson v. City of Houston*, 444 F. App'x 26, 31 (5th Cir. 2011) (per curiam) ("[A]s a general rule,

---

[10] Because the only difference between claim splitting and res judicata is that the latter requires satisfaction of two additional elements—a court of competent jurisdiction and final judgment on the merits—the undersigned relies on cases discussing traditional claim preclusion to determine whether Welsh's claims against Diaz and Maddox involve the same party and claims.

the identity requirement for claim preclusion is not fulfilled when a person participates in two different suits in different capacities."). Thus, the "critical issue is whether the two actions are based on the 'same nucleus of operative facts.'" *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005) (citation omitted).

Because Welsh's claim in the instant case and in case number 5:20-cv-024 arise from the same Jail policy which purportedly results in a blanket ban on ordering outside books, Welsh's claims arise from the same nucleus of operative fact, and should be barred. Welsh claimed in case number 5:20-cv-024 that due to the Jail's policy on outside vendor books, Diaz, Maddox, and others denied his requests to order books. *See Welsh v. Lamb Cnty.*, No. 5:20-cv-00024-H, ECF No. 30 (accepting in part the undersigned's FCR and allowing Welsh's book-policy claims to move forward). These claims arose from 2017–2018, when Welsh was detained in the Jail on other criminal charges. *See id.* at Am. Compl. 2 ("Plaintiff was incarcerated at the Lamb County Jail from Nov. 28, 2017 to . . . about June 20[], 2018 for tampering and fabricating evidence."). The district judge's decision to order Diaz and Maddox to answer as to these book claims was based on Welsh's objections and motion to supplement his Amended Complaint—which the district judge granted (*see id.* at ECF No. 30, at 27–30)—clarifying that he was not alleging an access to courts claim based on the denial of book purchases. *See id.* at ECF No. 25, at 24–27 (Welsh's objections, postmarked Sept. 11, 2020). Instead, Welsh made clear he was asserting that his First Amendment rights to the "expression of ideas and rights to publication" were violated by being denied the ability to order several requested books. *See id.* at ECF No. 25, at 25; *see also id.* at ECF No. 93, at 6 ("[Welsh] asserts that Defendants Maddox . . . and Diaz implemented an unconstitutional policy, which prohibited Lamb County Jail inmates from purchasing or receiving any book from any outside source.").

21

Here, Welsh's claims are based on Diaz and Maddox's purported denial of a request to order an outside book and that he did not receive the newsletters he ordered based on the same policy, during a different period of incarceration. *See* Compl. 4 (alleging that Defendants did not approve any book requests from September 15, 2020, to November 5, 2021). Welsh claims that this denial was based on the same policy that denied him outside books in case number 5:20-cv-024, and that it was not until "Judge Hendrix ruled in a prior case"—i.e., 5:20-cv-024—that this policy "violated [Welsh's] First Amendment rights [that] Sheriff Maddox change[d]" the policy on November 5, 2021.[11] Questionnaire 3–4.

Welsh's claims arise out of the same nucleus of operative fact—the alleged policy resulting in the denial of his publication order requests. Because the issue of whether the book policy claim violates his First Amendment rights is already being litigated, Welsh should not be able to pursue this identical claim just because he was denied the ability to order another book at a later time. *Cf. Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1089 (5th Cir. 2022) (reversing district court's holding that plaintiff's claims regarding the university's admission policies were barred by res judicata because the claims were not related in time and space and plaintiff alleged the university was "employing a different policy than the one [previously] challenged"); *see Riggleman v. Clarke*, No. 7:22-cv-00018, 2023 WL 2505490, at *4 (W.D. Va. Mar. 14, 2023) (finding claims barred by claim splitting despite plaintiff alleging "different injuries [that] arose out of a different set of core events that occurred subsequent" to filing his complaint in the first case; while claims focused on a different time period, they were based on the same injury and events—denial of treatment); *see also Ameritox, Ltd.*, 2009 WL 305874, at *4 ("[C]laim

---

[11] The Court understands Welsh as referencing the district judge's order denying qualified immunity to Maddox and Diaz, which found that, "viewing the facts in the light most favorable to [Welsh], there is a genuine issue of material fact as to whether Lamb County banned receipt of all outside books and publications" by policy. *See Welsh v. Lamb Cnty.*, No. 5:20-cv-00024-H, ECF No. 93, at 21–26.

splitting prohibits a plaintiff from prosecuting its case piecemeal and requires that all claims arising out of a single wrong be presented in one action." (quoting *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 273 F. App'x 256, 265 (4th Cir. 2008))).

Moreover, even though these claims arise from a different period of incarceration at the Jail, Welsh still could, and should have brought these claims in case number 5:20-cv-024 rather than filing a duplicative action. *Advanced Micro Devices, Inc. v. Polaris Innovations Ltd.*, No. 1:23-CV-00304-DAE, 2023 WL 9183303, at *3 (W.D. Tex. Nov. 13, 2023) ("[T]he claims that could have and should have been asserted in the previous action 'must be barred under the rule against claim splitting.'" (citation omitted)). While "'subsequent wrongs by a defendant constitute new causes of action' not barred by res judicata when those wrongs 'occurred either after the plaintiff[] had filed [his] prior lawsuit or after the district court entered judgment in the prior lawsuit,'" this does not counsel against finding Welsh's claims precluded. *Sacks v. Tex. S. Univ.*, 83 F.4th 340, 345 (5th Cir. 2023) (per curiam) (quoting *Davis v. Dall. Area Rapid Transit*, 383 F.3d 309, 314 (5th Cir. 2004)). Welsh filed the instant case on September 19, 2022 (*see* ECF No. 1), alleging purported constitutional violations due to the policy from September 15, 2020, to November 5, 2021. Compl. 4. These alleged violations began approximately two weeks after the FCR was entered and mere days after Welsh mailed his objections in case number 5:20-cv-024. *See Welsh v. Lamb Cnty.*, No. 5:20-cv-00024-H, ECF Nos. 22 (FCR entered Aug. 31, 2020), 25 (Welsh's objections, mailed Sept. 11, 2020). Welsh, however, did not move for leave to amend his Amended Complaint. Instead, he tried to inject these claims into case number 5:20-cv-024 by raising them for the first time in his response to defendants' motion for summary judgment. *Id.* at ECF Nos. 85, 86, 87; *see also id.* at ECF No. 93, at 6–7 (noting that defendants' "policy affected [Welsh] during at least two separate periods of confinement" but only considering claims from

2017/2018 because Welsh "is not entitled to have identical claims reviewed by multiple judges at the same time" and could not "supplement his claims on a rolling basis").

Thus, because the subsequent events related to Welsh's underlying claims occurred while case number 5:20-cv-024 was pending and in its early stages (i.e., while Defendants were being served and answering as to Welsh's claims (*see id.* at ECF Nos. 34–46)), Welsh could and should have brought these claims to prevent piecemeal and duplicative litigation. *See Advanced Micro Devices, Inc.*, 2023 WL 9183303, at *3; *Anderson v. Hous. Cmty. Coll. Sys.*, 90 F. Supp. 3d 667, 672 (S.D. Tex. 2015) (concluding res judicata barred later retaliation claims that accrued after first case had been filed but before entry of final judgment, where there was no evidence court "prohibited [plaintiff] from amending her petition or that [she] attempted to amend her petition"); *Sensormatic Sec. Corp.*, 273 F. App'x at 265 ("When one suit is pending in federal court, a plaintiff has no right to assert another action 'on the same subject in the same court, against the same defendant at the same time.'" (citation omitted)).  Therefore, the undersigned recommends the district judge dismiss Welsh's claims against Administrator Diaz and Sheriff Maddox for allegedly denying him outside books and other publications as barred by claim splitting.

### 2. *Cable Channels, Radio, Video Games, and Internet Access*

Welsh contends that Lamb County denied him internet access, which prevented him from voicing his opinion in the Texas Supreme Court election and violated his First Amendment rights; and that both Lamb County and Sheriff Maddox violated his First Amendment rights by switching the cable system and denying him radio and video games.

Welsh brings claims against Sheriff Maddox and Lamb County under the First Amendment based on the Jail's switch from a cable system that provided fifty channels to one that "only provide[s] access to 4 channels."  Compl. 12.  Welsh asserts this was "a prior restraint upon the

enjoyment of first amendment activities . . . without even the ability to speak upon the appropriateness of the channel itself." *Id.* at 13. Welsh also contends there is a "blanket ban" on the radio and the "Jail has no ability to access the content the radio provides." *Id.*; Questionnaire 15. According to Welsh, TDCJ allows radios and thus the Jail policy "restricting radios is an over exaggerated response to any security concerns and is intended to punish." Compl. 13. He alleges the same with respect to video games. *Id.* at 13–14. He contends he has a First Amendment right to both the radio and video games. *Id.* Lastly, Welsh avers his First Amendment rights were violated when he was denied requested internet access so that he could "express his voice" in the Texas Supreme Court election.[12] *Id.* at 11. Welsh asserts that because he had no other means to participate, the Jail's "arbitrary and purposeless" restriction prevented him from stating his views. *Id.* According to Welsh, the internet is a public forum and the Jail's "prohibition sweeps to[o] broadly." Questionnaire 12. Welsh does not specify whether he brings these claims against Sheriff Maddox[13] in his individual or official capacity, but to the extent he intends to sue Maddox in his individual capacity, these claims should be dismissed.

Welsh claims his rights were violated based on his purported First Amendment right to video games, the radio, television, and the internet. Because prisoners have no First Amendment right to these materials, the undersigned recommends dismissal. *See Miranda v. Lumpkin*, No. 2:21-CV-00271, 2022 WL 1462201, at *1 (S.D. Tex. May 9, 2022) ("[U]nlike printed materials,

---

[12] Welsh complains merely about being denied the ability to speak in an unspecified setting or forum—besides the general internet—and voice his opinions on the Texas Supreme Court election. Compl. 11. As the word "vote" does not appear one time in his Complaint, the undersigned does not construe Welsh's allegations as asserting that he was denied the right to vote.

[13] Welsh pleaded specific facts alleging Sheriff Maddox's enforcement or involvement with his video games, cable channels, and radio claims; however, Welsh does not appear to assert his internet access claim against Sheriff Maddox. *See* Compl. 11–12 (pleading no facts related to any specific individual). Thus, the undersigned construes Welsh's allegations as only asserting a policy claim for denying internet access, which should be dismissed along with the policy claims for denying radio and video game access and switching the cable system because, as discussed, he fails to state a constitutional violation. *See infra* Sections II.C.2., II.I.1.

watching television does not implicate any First Amendment interest sufficient to warrant protection." (quoting *Manley v. Fordice*, 945 F. Supp. 132, 137 (S.D. Miss. 1996) ("No court has recognized a federal constitutional right to the usage of radio and television by inmates."))); *Duenes v. Wainwright*, No. A-17-CV-0726-LY, 2017 WL 6210904, at *3 (W.D. Tex. Dec. 7, 2017) ("State inmates do not have a federal constitutional right to possess computers or to access the Internet."); *Schwarzer v. Wainwright*, No. 6:18-CV-00034, 2023 WL 2950639, at *24 (S.D. Tex. Jan. 17, 2023) ("[T]he undersigned has found no authority . . . indicating that prohibiting gaming . . . violates the First Amendment."), *R. & R. adopted by* 2023 WL 2645538 (S.D. Tex. Mar. 27, 2023).

Thus, the undersigned recommends the district judge dismiss Welsh's claims against Lamb County and Sheriff Maddox in his individual capacity, i.e., that denying Welsh access to radio and video games and switching the cable system, violated his First Amendment rights.

### 3. Retaliation for Filing Grievances

Welsh avers Jailers violated his First Amendment rights when they retaliated against him and harassed him after he filed a grievance against Jailer Whitaker.

Welsh alleges that he complained through grievances and directly to Jailers' supervisors about Jailer Whitaker hiding some of his mail. Compl. 17–18. Welsh also contends that following his complaints, Jailers intentionally made noise during routine checks "in order to harass him." *Id.* at 18. Welsh asserts that because he complained about his legal mail not being delivered, they "slam[med] the window door aggressively . . . when they saw [he] was sleeping." Questionnaire 19. Welsh avers Jailers also harassed him by delaying his meals "until [they were] cold" and Jailer Whitaker apparently said Welsh was "lucky" he gets to eat at all considering how much he complains about his legal mail. *Id.* at 19–20. Jailers purportedly "inform[ed] Welsh at various

times the harassment [was] because of Welsh filing grievances and complaining" to their supervisors. Compl. 18. The Jail allegedly allowed this harassment[14] and retaliation to continue despite Welsh's grievances informing supervisors Diaz and Maddox of the situation on multiple occasions. Questionnaire 19.

A plaintiff must demonstrate the following to establish an actionable claim for retaliation: "(1) the existence of a specific constitutional right; (2) the defendant's intent to retaliate for the exercise of that right; (3) a retaliatory adverse act; and (4) causation." *Freeman v. Tex. Dep't of Crim. Just.*, 369 F.3d 854, 863 (5th Cir. 2004) (citing *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995)). Conclusory allegations, including a prisoner's personal belief that he is the victim of retaliation, are insufficient to support a claim for retaliation. *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999) (per curiam) (citing *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997)). Instead, "'[t]he inmate must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred.'" *Haddix v. Kerss*, 203 F. App'x 551, 554 (5th Cir. 2006) (per curiam) (quoting *Woods*, 60 F.3d at 1166). In evaluating such claims, the Fifth Circuit has cautioned that "[p]risoners' claims of retaliation are regarded with skepticism" and should be "carefully scrutinized by the courts." *Adeleke v. Fleckenstein*, 385 F. App'x 386, 387 (5th Cir. 2010) (per curiam) (citing *Woods*, 60 F.3d at 1166).

At the outset, the Court notes that the filing of a non-frivolous grievance can be a constitutionally protected activity. *Gonzales v. Gross*, 779 F. App'x 227, 230 (5th Cir. 2019) (per

---

[14] Welsh attempts to bring claims of retaliation and "harassment" based on these facts. *See* Compl. 26 (alleging Jailers' conduct violated Welsh's "substantive due process right not to be harassed"). The Fifth Circuit, however, has long recognized that verbal threats or harassment made by an officer do not constitute a basis for a § 1983 claim. *Robertson v. Plano City*, 70 F.3d 21, 24 (5th Cir. 1995) (citing *McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983)). Verbal threats, abusive language, or other harassment, "while unprofessional and inexcusable, are simply not sufficient to state a constitutional claim under 42 U.S.C. § 1983." *Johns v. Miller*, No. 05-2489, 2005 WL 3592248, at *7 (E.D. La. Oct. 26, 2005) (citing *Slagel v. Shell Oil Refinery*, 811 F. Supp. 378, 382 (C.D. Ill. 1993)), *aff'd*, 23 F.3d 410 (7th Cir. 1994). The undersigned thus only proceeds to assess the merits of Welsh's retaliation claims.

curiam) (quoting *Brown v. Taylor*, 911 F.3d 235, 245 (5th Cir. 2018) (per curiam)); *see also Baughman v. Hickman*, 935 F.3d 302, 312 (5th Cir. 2019) (noting that the "First Amendment protects a detainee from retaliation for filing grievances" and applying the four factor test). Thus, Welsh has arguably met the first element of a retaliation claim—that he exercised a constitutional right. *See, e.g.*, Compl. 18 (alleging Defendants retaliated after Welsh filed grievances regarding their treatment of Welsh's legal mail). The Court therefore turns to the discrete acts Welsh alleges were retaliatory.

Welsh contends that because he filed a grievance, Jailers purposefully made noise to wake him during nightly checks and only served his meals after they were cold. *Id.*; Questionnaire 19–20. He also asserts that Jailers "inform[ed] Welsh at various times" that these actions were because Welsh "fil[ed] grievances and complain[ed] to" Jailers' supervisors, Diaz and Maddox. At the screening stage, this is sufficient to show intent to retaliate based on Welsh's grievance complaints. *See Scott v. Turner*, No. 18-626-BAJ-EWD, 2019 WL 8752337, at *4 (M.D. La. Oct. 21, 2019) (determining allegations that defendant "made statements indicating his intent to retaliate . . . , such as 'I'll give you harassment'" were sufficient to show retaliatory motive at the screening stage), *R. & R. adopted by* 2020 WL 1154759 (M.D. La. Mar. 10, 2020); *Williams v. Caudillo*, No. 5:21-CV-106-BQ, 2022 WL 16935655, at *13 (N.D. Tex. Feb. 28, 2022) (finding that plaintiff alleged sufficient facts for a retaliatory assault claim because officer "told him it was because he didn't keep his mouth shut about [his cellmate's] assault" (internal quotation marks omitted) (brackets omitted)), *R. & R. adopted by* 2022 WL 16935246 (N.D. Tex. Nov. 14, 2022).

The Jailers' adverse acts, however, do not amount to a constitutional violation. *See Morris v. Powell*, 449 F.3d 682, 685 (5th Cir. 2006) (noting that even where proper retaliatory intent is alleged, retaliation claim fails where "retaliatory adverse acts did not rise to the level of a

constitutional violation" (citing *Jones*, 188 F.3d at 325–26)). To succeed on a retaliation claim, Welsh must allege more than "inconsequential, or *de minimis*, retaliatory acts by prison officials." *Id.* at 684. The claimed retaliatory acts—serving Welsh cold food and slamming his window shut to wake him up an unspecified number of times—fail to meet this standard. *See, e.g., McGarrah v. Kimbrow*, No. 3:13-CV-2088-B-BK, 2015 WL 105228, at *5 (N.D. Tex. Jan. 6, 2015) ("[T]he fact that food was served cold or at improper temperatures does not rise to a constitutional deprivation."); *Walton v. Grounds*, No. SA-10-CA-60-NSN, 2011 WL 632842, at *2 (W.D. Tex. Feb. 11, 2011) (recognizing that "intermittent disruptions to prisoners' sleep due to lights or noise" does not state a constitutional violation (collecting cases)).

Moreover, Welsh admits that he continued to file grievances and complain to Diaz and Maddox despite Jailers' acts, further demonstrating their *de minimis* nature because Welsh does not allege it chilled him from continuing to pursue constitutionally protected activities. *See* Questionnaire 20 (alleging that even though he continued to file grievances, Sheriff Maddox and Administrator Diaz "allowed the retaliation to continue"); *Morris*, 449 F.3d at 686 ("Retaliation against a prisoner is actionable only if it is capable of deterring a person of ordinary firmness from further exercising his constitutional rights."). Because the acts Welsh attributes to Jailers "are so *de minimis* that they would not deter the ordinary person from further exercise of his rights," Welsh fails to state a retaliation claim. *See, e.g., Moore v. Charles*, No. 4:14cv825, 2017 WL 750311, at *3 (E.D. Tex. Feb. 27, 2017) (concluding plaintiff's retaliation claim failed in part because defendant's alleged retaliatory act was *de minimis* and "would not deter a person of ordinary firmness from exercising their rights"); *Hill v. Gatson*, No. G-03-966, 2007 WL 869536, at *2 (S.D. Tex. Feb. 15, 2007) (noting that prisoner had not alleged that defendant's filing of an allegedly false disciplinary infraction "prevented or chilled [prisoner] from filing [additional]

grievances"); *Johnson v. Parks*, No. 5:03–CV–024–C, 2004 WL 2101669, at *5 (N.D. Tex. Sept. 15, 2004) (dismissing prisoner's retaliation claim in part because he did not demonstrate that defendant's action caused prisoner to stop, or prevented him from, filing grievances or lawsuits), *aff'd*, 182 F. App'x 300 (5th Cir. 2006).

Thus, because the claimed retaliatory acts are *de minimis*, the undersigned recommends the district judge dismiss Welsh's retaliation claim against Jailers Whitaker, Molina, and Fultz.

### 4. *Phone prices*

Welsh claims that Lamb County inflates the Jail's phone prices, which "chill" his ability to exercise his First Amendment rights. *See* Compl. 14–15. Welsh should be barred from bringing this claim under res judicata.[15]

Claim preclusion, also known as res judicata, "bars the litigation of claims that either have been litigated or should have been raised in an earlier suit." *Test Masters Educ. Servs., Inc.*, 428 F.3d at 571. Claim preclusion requires the satisfaction of four elements: "(1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions." *Id.*

Welsh claimed in case number 5:20-cv-024 that the Jail's "expensive phone rates . . . violate his First Amendment right to speech." *See Welsh v. Lamb Cnty.*, No. 5:20-cv-00024-H, ECF No. 22, at 32. The Court determined in that case that "the Jail allegedly charging what Welsh believes to be high phone-time rates does not violate the Constitution" (*id.* at 33) and ultimately dismissed because Welsh failed to state a constitutional violation. *See* ECF No. 30, at 24–26 (adopting FCR and dismissing Welsh's claim that "exorbitant prices" for phone calls violated his

---

[15] For the reasons discussed above (*see supra* Section II.C.1.), the Court may raise res judicata on its own volition and determine whether Welsh is precluded from bringing such claims.

First Amendment rights). Moreover, this holding was left undisturbed by Welsh's appeal to the Fifth Circuit. *See Welsh v. Lamb Cnty.*, No. 22-10124, 2023 WL 3918995, at *2, *6 (5th Cir. June 9, 2023). Thus, because Welsh's phone price claims were dismissed with prejudice, as affirmed by the Fifth Circuit, the final judgment element is met. *See Hall v. United States*, No. 6:06-CV-528, 2008 WL 276397, at *5 (E.D. Tex. Jan. 30, 2008) ("[T]he judgment was affirmed on appeal" and "was sufficiently final . . . for *res judicata* purposes . . . ."); *Garrett v. BBVA Compass Bank*, No. 3:19-CV-1491-C-BH, 2020 WL 3065938, at *6 (N.D. Tex. May 22, 2020) (finding the final judgment on the merits element met because the previous actions were dismissed "with prejudice for failure to state a claim upon which relief could be granted under . . . § 1915(e)(2)(B)(ii)"), *R. & R. adopted by* 2020 WL 3064800 (N.D. Tex. June 8, 2020).

Next, no question exists as to whether this Court is a court of competent jurisdiction, having the power to adjudicate Welsh's claims, including those asserted in case number 5:20-cv-024. *See Welsh v. Lamb Cnty.*, No. 5:20-cv-00024-H, ECF Nos. 22, 30 (dismissing all claims against Lamb County for charging "high" phone-time rates, which Welsh claimed restricted his ability to connect with friends and family and violated his First Amendment rights). As such, the only remaining questions are whether the claim in this case is the same claim and against the same party.

Here, Welsh claims under identical circumstances—i.e., the same jail, same policy, same defendant (Lamb County), and same cause of action—that the Jail's allegedly high phone charges violate his First Amendment rights. Welsh already had his bite at this apple, and the Court determined that the claim lacks merit. As such, res judicata bars Welsh from bringing this identical claim. *See CRU Shreveport, LLC v. United Nat'l Ins. Co.*, No. 5:20-0151, 2021 WL 5054165, at *4 (W.D. La. July 28, 2021) (finding identical claim element met because "[t]he causes of action ar[o]se out of the exact same facts and [were] exactly the same"); *Torres v. Johnson*, No. 2:21-

31

CV-00138, 2021 WL 5548562, at *3 (S.D. Tex. July 26, 2021) (dismissing plaintiff's claims as barred by res judicata because they were "essentially duplicative of his claims raised" in the previous case related to conditions at the jail), *R. & R. adopted by* 2021 WL 5036014 (S.D. Tex. Oct. 29, 2021).

Because the Court previously assessed the merits of and dismissed Welsh's First Amendment claim based on Lamb County's pricing for phone usage at the Jail, the undersigned recommends the district judge dismiss this identical claim as barred by res judicata.

### D. Excessive Force and Bystander Claims

Welsh claims that at two different times, excessive force was used against him by: (1) Deputies Klatt, Armstrong, and Cotton, Sheriff Maddox, Administrator Diaz, and Lamb County when they handcuffed him before taking him to his medical appointment at UMC; and (2) Deputies Thompson and Weston when they were trying to handcuff Welsh before transporting him to TCCC. In addition, during the second use of force incident, Welsh asserts Jailer Martinez and MTC employees Winckler and Powell failed to intervene.

The United States Supreme Court has recognized that a pretrial detainee's use of force claim arises under the Fourteenth Amendment. *See Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015) (abrogating lower courts' application of Eighth Amendment excessive force standards in *Hudson v. McMillian*, 503 U.S. 1 (1992) to pretrial detainees). To sufficiently state an excessive force claim "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396–97. "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The reasonableness of the force used must be assessed "from the perspective and with the knowledge of the defendant officer" and with "deference to policies and practices needed

to maintain order and institutional security." *Id.* at 399–400. In determining the objective reasonableness of an officer's use of force, a court should consider the following non-exclusive factors: (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. *Id.* at 397.

### 1. *During Transport to Medical Appointment*

On January 12, 2021, Welsh alleges that Jail personnel came to his cell to take him to a medical appointment at UMC, but he refused to go with them. Compl. 8. He contends that Administrator Diaz then authorized the use of force if he did not agree to go, and Deputy Armstrong said he "did not have a choice," which Welsh perceived as a threat. *Id.* at 8–9. Welsh then went with officers "[u]nder duress" and was put in full restraints—i.e., handcuffs and ankle shackles—by Deputies Armstrong and Klatt. *Id.* at 9. Welsh alleges that being in full restraints while waiting for two hours for his appointment caused him pain and scarred his wrists. *Id.* at 10. Because Welsh alleges that he was "punished . . . through shamming [sic] and injur[ies] . . . through the purposeful application of restraints," the undersigned construes Welsh's allegations as an excessive use of force claim for using hand restraints to escort him to his medical appointment.[16] *Id.* at 25. The undersigned recommends the district judge dismiss Welsh's claim.

---

[16] Welsh alleges this claim against Sheriff Maddox, Lamb County, Administrator Diaz, Deputy Armstrong, Deputy Klatt, and Deputy Cotton. Compl. 9, 25. Welsh, however, includes no supporting facts for his claims against Cotton. *See id.* at 2, 25, 29 (mentioning Cotton only four times in connection with the capacity Welsh sues him in, the "Count" against him, and the relief sought). Because Welsh fails to assert any facts against Cotton, the undersigned does not analyze any potential claims against him and recommends that the district judge dismiss all claims against Cotton. *See San Miguel v. Cochran*, No. 5:20-CV-041-BQ, 2020 WL 7700633, at *5 (N.D. Tex. Nov. 25, 2020) (recommending dismissal of plaintiff's claims against defendant because he did "not allege a single fact that connect[ed] her to the purported constitutional violations"), *R. & R. adopted by* 2020 WL 7698760 (N.D. Tex. Dec. 28, 2020).

Initially, the Court observes that Welsh's claim against Administrator Diaz and Sheriff Maddox based on a purported use of force should be dismissed. Welsh alleges that Diaz "authorized" the use of force if Welsh refused orders. Welsh also asserts Deputy Klatt called Sheriff Maddox while Welsh was fully restrained. Compl. 9. Welsh, however, pleads no facts indicating that Administrator Diaz or Sheriff Maddox participated in the force or otherwise violated his rights during the use of force. *Id.* at 8–10; *see* Questionnaire 11. "Personal involvement is an essential element of a civil rights cause of action." *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983). Thus, to the extent Welsh attempts to assert a claim of excessive force against Administrator Diaz and Sheriff Maddox, it should be dismissed.

Turning to the merits of his claim, Welsh's claims appear to be akin to those in *Heitschmidt v. City of Houston*, 161 F.3d 834 (5th Cir. 1998). There, plaintiff claimed that he was handcuffed tightly for four-and-a-half hours, causing him severe pain and "permanent serious injury to his wrists . . . , for which he . . . sought medical treatment." *Id.* at 835–36. Plaintiff also made officers aware "that the handcuffs were painfully tight and requested that they be loosened," but his requests were denied. *Id.* at 836. Here, Welsh has made no allegation that the restraints were applied too tightly or inappropriately, or that he asked officers to loosen or remove them. *See* Compl. 9–10. *Heitschmidt* is also distinguishable because Welsh was detained for only about two hours due to a delay in his medical appointment, and not because Deputies Armstrong and Klatt unreasonably or maliciously prolonged the length of time Welsh needed to be restrained. *See Tarver v. City of Edna*, 410 F.3d 745, 751–52 (5th Cir. 2005) (concluding plaintiff failed to state an excessive force claim because he only "suffered 'acute contusions of the wrist' and psychological injury," and plaintiff did "not contend that the officers maliciously or even purposely used the handcuffs to inflict harm upon him").

Without more, simply using hand and leg restraints to transport Welsh to his medical appointment does not constitute excessive force. *Templeton v. Jarmillo*, 28 F.4th 618, 622 (5th Cir. 2022) ("Tight handcuffing alone, even where a detainee sustains minor injuries, does not present an excessive force claim." (citing *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) ("handcuffing too tightly . . . d[id] not amount to excessive force," where plaintiff's only injury was a swollen wrist and there was no allegation the officer acted with malice))); *Thomas v. Nino*, No. 2:22-CV-00252, 2023 WL 4444974, at *6 (S.D. Tex. Jan. 25, 2023) (dismissing at screening plaintiff's claims that defendants unconstitutionally used force when they "rear-cuffed" him because he made "no allegations to suggest that [officer] handcuffed [him] in an unusually rough or inappropriate manner"), *R. & R. adopted by* 2023 WL 3973610 (S.D. Tex. June 13, 2023); *Williams v. Hunt Cnty., Tex. Sheriff Dep't*, No. 3:17-cv-3264-D-BN, 2018 WL 2031915, at *7 (N.D. Tex. Apr. 4, 2018) (recommending dismissal of detainee's excessive force claim for officers' application of shackles that "harshly compress[ed his] ankles" because "shackles are commonly used in a jail, especially in transporting a detainee" and "were [not] used outside of a normal purpose or for an abnormally long period of time"), *R. & R. adopted by* 2018 WL 2018592 (N.D. Tex. May 1, 2018). On this basis alone, Welsh's claim is not viable.

In sum, finding that Welsh's claim is essentially that the use of restraints to any degree constitutes excessive force, the undersigned recommends that the district judge dismiss such claim against: (1) Sheriff Maddox and Administrator Diaz because they were not personally involved; and (2) Deputies Armstrong and Klatt because Welsh failed to allege that (a) the handcuffs were applied too tightly, (b) he informed Deputies they were causing him pain, or (c) Deputies maliciously used or extended the time Welsh was in restraints.

## 2. *After Release*

Welsh also claims Deputies Thompson and Weston used excessive force against him and that Jailer Martinez and MTC employees Winckler and Powell should have stopped them.

On March 4, 2022, Welsh alleges he was released from the Jail because all pending charges against him were dropped.[17] Compl. 20. Welsh was released back to TCCC and escorted by MTC employees Winckler and Powell. *Id.* Winckler told Welsh he had to be cuffed during the escort, despite Welsh informing him of "Texas Health and Safety Code [Section] 841.0838 that" only permits the use of hand restraints if "Welsh is a physical threat and it is necessary to prevent imminent injury." *Id.* Deputy Weston then apparently told Welsh he would cuff him. *Id.* at 21. Welsh stood up and in response, "Weston shoved Welsh down[,] Welsh then stood back up," and "Thompson and Weston took Welsh to the ground." *Id.* Welsh asserts Thompson then put him in a choke hold and Weston bent Welsh's arms, causing Welsh pain, bruising on his neck and soreness in his arms for weeks, open wounds around his wrists from the restraints, agitation of his "bilateral neuropathy" resulting in loss of feeling in his hands for weeks, depression, loss of sleep, and anxiety. *Id.*; Questionnaire 23. During the purported use of force, Welsh contends Jailer Martinez "secured [his] legs and stood by[] with Winckler and Powell as Thompson and Weston assaulted Welsh." Compl. 22. Winckler purportedly told Welsh he was being restrained "because of his past assaultive behavior"; specifically, "the criminal case [Welsh was] being discharged for." *Id.*

---

[17] It is unclear whether Welsh would be properly designated as a pretrial detainee or SVP at this point in time; however, the same standard for excessive use of force applies to both classifications. *See Andrews v. Neer*, 253 F.3d 1052, 1061 (8th Cir. 2001); *Davis v. Rennie*, 264 F.3d 86, 108 (1st Cir. 2001); *see also Welsh v. Correct Care Recovery Sols.*, 845 F. App'x 311, 317 (5th Cir. 2021) (applying pretrial detainee standard to Welsh's force claims while at TCCC, where "Welsh d[id] not contest th[at] standard").

According to Welsh, both the act of placing him in cuffs, and subsequently putting him in a chokehold and forcing him to the ground, constituted excessive force. Questionnaire 22. Welsh explains Winckler, Powell, and Martinez also allowed the excessive force because Winckler and Powell "solicited" it and all three were "present during the entire use of force" but "never even spoke up to try and verbally stop the use of restraints." *Id.* at 23–24. In Welsh's view, the use of force also denied him his state created liberty interest because restraints cannot be applied to Welsh unless it falls under the parameters of § 841.0838, and here, it did not. *Id.* at 23. Welsh also asserts that he wrote a letter to Sheriff Maddox afterwards, and he "deliberately ignored" it by stating that there was "no violation of rights." *Id.* at 25; Compl. 22.

Video evidence brings greater context to these events. "Because video evidence is available, we are required to 'view the facts in the light depicted by the videotape.'" *Boyd v. McNamara*, 74 F.4th 662, 666 (5th Cir. 2023) (citation omitted); *see Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that the district court did not have to accept the plaintiff's description of his driving where it was "blatantly contradicted by" video from the police car's dash cam).

While still in the Jail, officers tell Welsh that he needs to be restrained before he is escorted out for transport to TCCC. A. Marquez (4) BWC [hereinafter Marquez BWC] 15:00–:11. Welsh begins arguing with them and yells, "I don't give a f*** about your policy . . . . What's up? What's up?," comes to his feet, and takes a step towards the officers. Marquez BWC 15:11–:17. Deputies Thompson and Weston (collectively, Deputies) motion for Welsh to sit back down and put their hands on his chest, and Welsh does so while exclaiming "don't touch me" and that he "doesn't want those g*****n shackles on." Marquez BWC 15:16–:23. Welsh continues to scream obscenities while Thompson tells him he must wear the cuffs, to which Welsh responds, "okay well, you're gonna make me." Marquez BWC 15:23–:45. Deputies then grab Welsh's arms and

37

pull him up, as Welsh yells "get your hands off me" and tries to get his arms free from their grip. Marquez BWC 15:45–:49. Deputies then lead him to the ground and hold him down with their hands on the back of his neck and legs while Administrator Diaz cuffs Welsh's ankles. Marquez BWC 15:49–16:37. While Welsh is still laying on his side with his upper body parallel to the floor and his hands on the ground holding him up, Thompson says he is trying to secure Welsh's hands and appears to struggle to get Welsh's hands off the ground. Marquez BWC 16:57–17:12. Weston tells Welsh he "needs to lay down" and Welsh replies "I am," but he still does not comply. Marquez BWC 17:12–17:20. Weston says "put your hands behind your back" and Welsh asks, "now you want them behind my back? What did I do?" Marquez BWC 17:20–:30. Thompson continues holding Welsh down on the ground while Welsh asks him several questions about why he is using force. Marquez BWC 17:30–18:09. Thompson then begins to let Welsh up and helps him to his feet while another officer puts restraints on Welsh's wrists. Marquez BWC 18:09–18:40. While the unknown officer is trying to shackle Welsh's right wrist, Thompson tries to take Welsh's left arm out of his shirt. Marquez BWC 18:40–:48. As Thompson merely pulls on Welsh's arm, Welsh begins screaming, "Ow! Ow! Ow! Ow! G*****n, why did you hit me? Why did you punch me . . . ?" Marquez BWC 18:48–:50; *see also* M. Diaz 3 BWC 7:18–:30. Welsh continues to struggle with officers as they apply cuffs to his wrists with his hands in front of him, before escorting him out. Marquez BWC 18:50–19:50.

Welsh concedes, and video evidence also shows, that Welsh refused Deputies' orders to submit to handcuffs and was actively arguing with them about it. *See* Compl. 20–21; Questionnaire 22. This justified some degree of force. *See Calhoun v. Wyatt*, No. 6:11cv4, 2013 WL 1882367, at *6 (E.D. Tex. May 2, 2013) (noting that inmate's refusal to obey orders "set the stage for the use of force"). Disobeying orders poses a threat to the order and security of an

institution. *Minix v. Blevins*, No. 6:06cv306, 2007 WL 1217883, at *24 (E.D. Tex. Apr. 23, 2007) (recognizing that even where prisoner believes an order to be unjustified or improper, such belief does not give him the right to disobey at his whim); *Rios v. McBain*, No. 504CV84, 2005 WL 1026192, at *7 (E.D. Tex. Apr. 28, 2005) (noting that "open defiance of orders plainly poses a threat to the security of the institution, regardless of whether or not the defiance is emanating from within a locked cell"), *R. & R. adopted by* 2005 WL 1026192 (E.D. Tex. Apr. 28, 2005). Thus, the fifth *Kingsley* factor—the threat perceived—weighs in Deputies' favor.

The first, third, fourth, and sixth *Kingsley* factors (i.e., the relationship between the need for the use of force and the amount of force used, any effort made by the officer to temper or limit the amount of force, the severity of the security problem at issue, and whether plaintiff was actively resisting) also weigh heavily in Deputies' favor.  Video evidence shows that Deputies spent significant time trying to convince Welsh to submit to handcuffs.  Welsh also stood up and stepped towards Deputies while yelling obscenities, to which Deputies were able to de-escalate briefly by getting Welsh to sit back down.  After Welsh refused yet again to submit to cuffs and proclaimed that Deputies would have to "make [him]," Deputies grabbed him by the arms and forced him to the ground.  They then struggled to cuff Welsh's ankles, merely holding him down on the ground until they could accomplish the task.  Such events show that Deputies tempered their use of force by first directing Welsh to submit to restraints willingly, and after he refused several times, Deputies used only the amount of force needed to get Welsh on the ground and shackle his ankles and wrists.  *See Orr v. Copeland*, 844 F.3d 484, 493 (5th Cir. 2016) ("When dealing with an uncooperative suspect, police act within the scope of objective reasonableness when they react with measured and ascending responses." (internal quotation marks, brackets, and citation omitted)); *Tennyson v. Villarreal*, 801 F. App'x 295, 296 (5th Cir. 2020) (per curiam) (reversing

denial of summary judgment for officers who tackled the non-compliant detainee to the ground to handcuff him behind his back). In the interim, Welsh made this more difficult by continuing to resist and refusing to relinquish his hands or lay down when ordered to do so by Deputies. *See, e.g., Diaz v. Ray*, No. 5:17-CV-025-BQ, 2017 WL 8790964, at *3 (N.D. Tex. Nov. 17, 2017) (applying *Kingsley* factors and dismissing pretrial detainee's excessive force claim where he failed to show the officer's use of force was objectively unreasonable—detainee suffered only minimal physical injury after officer applied force to obtain compliance and maintain institutional discipline and security). Moreover, while Welsh claims that Deputies "put him in a choke hold" and "bent his arms," video evidence shows that Deputies did neither of those things.[18] *See Tilmon v. Texas*, No. A–14–CA–465–SS, 2015 WL 1292252, at *5 (W.D. Tex. Mar. 23, 2015) (concluding detainee failed to allege excessive force where his "version of events of the [incident] [was] clearly refuted by the video evidence").

Lastly, the second *Kingsley* factor (i.e., the extent of plaintiff's injury) also weighs in Deputies' favor. Welsh claims his neck and arms were bruised, his wrists had lacerations, and that he suffered pain, as well as psychological trauma, causing him sleepless nights. Compl. 22. Although no particular quantum of injury is required (*Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)), the extent of injury is an important factor courts assess in determining whether the amount of force used on a pretrial detainee was reasonable. *See Kingsley*, 576 U.S. at 397. Courts consistently dismiss cases where the complaint alleges nothing more than *de minimis* injury. *See, e.g., Siglar v. Hightower*, 112 F.3d 191, 193–94 (5th Cir. 1997) (affirming district court's dismissal of plaintiff's claim for excessive force where injury consisting of "a sore, bruised ear lasting for three

---

[18] Similarly, the video clearly demonstrates that despite Welsh screaming, "Ow! Ow! Ow! Ow! G*****n, why did you hit me? Why did you punch me . . . ?" (Marquez BWC 18:48–:50; *see also* M. Diaz 3 BWC 7:18–:30), the Deputies engaged in none of this conduct.

days" was *de minimis*); *Young v. Saint*, No. 92-8420, 1993 WL 117991, at *1 (5th Cir. Mar. 31, 1993) (affirming order dismissing complaint pursuant to 28 U.S.C. § 1915 where injuries consisting of "an undetermined amount of blood and . . . two small scratches" were *de minimis* (internal quotation marks omitted)); *Hodge v. Williams*, No. 4:08-CV-330-Y, 2009 WL 111565, at *3 (N.D. Tex. Jan. 16, 2009) (finding as *de minimis* inmate's claimed injuries of "cuts on his hand, a cut inside his lip and a sore neck" (internal quotation marks omitted)), *aff'd*, 343 F. App'x 979 (5th Cir. 2009); *Jordan v. Liddell*, No. 3:16CV467TSL-RHW, 2017 WL 4582343, at *3 (S.D. Miss. Oct. 13, 2017) ("bruising on her arm and anxiety, for which she did not seek medical treatment for nearly three weeks . . . is appropriately categorized as *de minimis*"); *Houston-Hines v. Hous. Indep. Sch. Dist.*, No. H-04-3539, 2006 WL 870459, at *2 (S.D. Tex. Apr. 5, 2006) (scratching, bruising, and soreness that lasted for about a week following the incident were *de minimis* injuries).

In sum, considering the facts as portrayed by the video, which directly contradict several of Welsh's allegations, Welsh fails to plead facts showing that the Deputies' use of force was objectively unreasonable. Accordingly, the undersigned recommends the district judge dismiss Welsh's claim for excessive force against Deputies Thompson and Weston.

Because Welsh's excessive force claims fail, his bystander liability claims necessarily suffer a similar fate. An official's failure to intervene in another's use of excessive force against an arrestee may violate the Constitution and subject the official to § 1983 liability. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). To prevail on a bystander liability claim, a plaintiff must establish that an officer: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017) (citation omitted).

Welsh's claim that Defendants Powell, Winckler, and Martinez should have intervened in Deputies' use of force should be dismissed for failure to state a claim. This is because there cannot be a viable bystander liability claim without an underlying constitutional violation. *See Buehler v. Dear*, 27 F.4th 969, 989 (5th Cir. 2022) (stating that "[b]ystander liability arises only where the plaintiff can allege and prove another officer's use of excessive force" (alteration in original) (citation omitted)); *Griffin v. City of Sugarland*, 787 F. App'x 244, 245 (5th Cir. 2019) (per curiam) ("Because his excessive force claim fails because there was no violation of his constitutional rights, [plaintiff's] bystander liability theory also fails."). Thus, the undersigned recommends the district judge dismiss Welsh's failure to intervene claims against MTC employees Winckler and Powell and Jailer Martinez for failure to state a claim.

### E. Alleged Use of Restraints and Denial of Medical Care

Welsh contends that his due process rights were violated by: (1) Deputy Armstrong, Deputy Klatt, Deputy Cotton, Sheriff Maddox, Administrator Diaz, Lamb County, Deputy Weston, Deputy Thompson, MTC Employee Winckler, MTC Employee Powell, and Jailer Martinez because they unlawfully restrained him; and (2) Administrator Diaz and Sheriff Maddox because they allegedly denied him mental health treatment.

Because "pretrial detainees and convicted state prisoners are similarly restricted in their ability to fend for themselves, the State owes a duty to both groups that effectively confers upon them a set of constitutional rights that fall under the Court's rubric of basic human needs." *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (internal quotation marks omitted).

"The constitutional rights of a pretrial detainee, [however], flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Id.* "Constitutional challenges by pretrial detainees may be brought under two alternative theories: as an attack on a

'condition of confinement' or as an 'episodic act or omission.'" *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009) (quoting *Hare*, 74 F.3d at 644–45). Where Welsh, a pretrial detainee at the time of the relevant events, complains about "a particular act or omission of one or more officials," i.e., Defendants purportedly putting him in restraints despite his alleged right to not be restrained, providing inadequate mental health care, and not allowing him to refuse a medical appointment,[19] the Court construes his claims as a "episodic act[s] or omission[s]." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999); *see Mayes v. Valdez*, No. 3:15-CV-3424-M-BH, 2017 WL 4075184, at *5 (N.D. Tex. Aug. 21, 2017) ("Because Plaintiff's factual allegations do not suggest a 'systematic failure' in failing to provide nutritionally adequate meals to detainees at the Jail, he presents an episodic act or omission claim."), *R. & R. adopted by* 2017 WL 4022890 (N.D. Tex. Sept. 13, 2017). To state a viable claim against an individual defendant in an episodic act or omission case, a detainee "must establish that the official(s) acted with subjective deliberate indifference to prove a violation of [his] constitutional rights." *Olabisiomotosho*, 185 F.3d at 526 (citation omitted). "Subjective deliberate indifference means the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk." *Id.* (internal quotation marks and citation omitted).

---

[19] Any claim Welsh brings against Sheriff Maddox, Deputy Klatt, Administrator Diaz, Deputy Armstrong, and Lamb County (Compl. 25) based on his right to refuse medical treatment under the Fourteenth Amendment (*see, e.g., Sama v. Hannigan*, 669 F.3d 585, 591 (5th Cir. 2012) ("[A] competent person has a liberty interest in refusing unwanted medical treatment" under the Due Process Clause of the Fourteenth Amendment.)), should be dismissed because video evidence directly contradicts his allegations. *See Scott*, 550 U.S. at 380. Video evidence shows that Deputies Klatt and Armstrong transported Welsh to UMC, and while waiting for Welsh's appointment, Deputy Klatt instructed Welsh that when they checked in for his appointment, he could refuse treatment. INV. Klatt BWC 3 0:00:47–:58. Welsh requested that they go back to the Jail to wait because his appointment was starting later than expected, but Klatt said "no . . . , because by the time [they] got back there, it would be time to turn . . . around" and he needed to refuse treatment in person. INV. Klatt BWC 3 0:00:58–01:12, 0:03:26–:34. Welsh later told the nurse at UMC that he did not want to be charged for the appointment or seen, and she went to go get the forms. INV. Klatt BWC 5. The nurse came back and notified Welsh that they notated in his chart that he refused to be seen, and Welsh left shortly thereafter. INV. Klatt BWC 6 0:00:01–:27. Thus, because video evidence shows he refused medical treatment, any claim that he was denied his right to refuse unwanted medical treatment should be dismissed.

### 1. *Restraints*

Welsh alleges that in two separate incidents, Defendants violated his substantive due process rights by handcuffing him. Compl. 25, 27. First, he contends Deputy Armstrong, Deputy Klatt, Deputy Cotton, Sheriff Maddox, Administrator Diaz, and Lamb County[20] unlawfully restrained him while transporting him to his medical appointment. *Id.* at 8–9, 25. Second, Welsh alleges an identical claim against Deputies Weston and Thompson, MTC Employees Winckler and Powell, and Jailer Martinez for handcuffing him before releasing him to TCCC. *Id.* at 20–22, 27.

Welsh claims that as an SVP, "Texas Health and Safety Code [Section] 841.0838" provides a liberty interest to not be placed in restraints because it only allows the use of hand restraints if "Welsh is a physical threat and it is necessary to prevent imminent injury." Compl. 20. This claim is without merit. Not only was Welsh detained in Lamb County Jail at the time of these violations,[21] where TCCC policy does not apply, violations of state law and jail and/or TCCC policy in and of themselves cannot form the basis of a § 1983 claim.[22] *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996) (per curiam) (jail policy); *Giovanni v. Lynn*, 48 F.3d 908, 912–13 (5th Cir. 1995) (state law); *Butler v. Arenivaz*, No. 5:20-CV-143-H-BQ, 2021 WL 2459483, at *8 (N.D. Tex. Mar. 9, 2021) (TCCC policy), *R. & R. adopted by* 2021 WL 2457187 (N.D. Tex. June 16, 2021). Thus, the undersigned recommends the district judge dismiss Welsh's substantive due process claims against Deputy Weston, Deputy Thompson, Deputy Klatt, Deputy Cotton, Deputy

---

[20] Welsh's claims against Lamb County for unlawfully restraining him are discussed *infra* in Section II.I.1.

[21] The Court acknowledges that during the second incident Welsh was being released to TCCC's custody. Even if this distinction is significant, for the reasons set forth *infra*, Welsh nevertheless fails to state a claim.

[22] Welsh does not invoke the Court's supplemental jurisdiction or otherwise indicate he is bringing claims under Texas state law. *See* Compl. 1 ("Lonnie Kade Welsh, files this action pursuant to, inter alia 42 U.S.C. [§] 1983, 15 U.S.C. § 1, 15 U.S.C. § 15, alleging violation[s] of the Fist [sic] and Fourteenth Amendment[s] to the Constitution of the United States of America and violation of Federal statute the Sherman Act.").

Armstrong, Jailer Martinez, Sheriff Maddox, MTC Employee Winckler, MTC Employee Powell, and Administrator Diaz based on the officers' use of restraints on two occasions.

### 2. *Mental Health Treatment*

Welsh also avers Sheriff Maddox and Administrator Diaz violated his Fourteenth Amendment rights by denying him mental health treatment.

Welsh asserts that on February 12, 2021, he told Administrator Diaz that he needed mental health treatment, and she scheduled an appointment with CPC in May 2021. Compl. 23. CPC, however, "informed Welsh that they do not treat his type of mental illness." *Id.* Welsh relayed this to Diaz, but she allegedly "refused to schedule an alternative provider . . . [and] continued to" schedule appointments at CPC. *Id.* Welsh wrote a letter to Sheriff Maddox about the issue. *Id.* He claims that "Diaz and Maddox [then] informed [him] that since . . . his mental disease only caused him to be a danger to others they are not required to give him treatment." *Id.* But according to Welsh, even though he was detained at the Lamb County Jail rather than TCCC, he "still ha[s] the behavioral abnormality that requires treatment."[23] Questionnaire 26. Welsh alleges he continued to request treatment and became depressed and suicidal without such treatment. Compl. 23.

Welsh's claim against Maddox fails because he has not shown that he was personally involved in the decision to deny Welsh medical treatment or was aware of the risks involved. "Personal involvement is an essential element of a civil rights cause of action." *Thompson*, 709 F.2d at 382. Welsh merely claims that he wrote Sheriff Maddox informing him of "his serious

---

[23] For the reasons previously discussed, because Welsh: (1) explicitly acknowledges that the statute entitling him to sex offender treatment was suspended while detained at the Jail; (2) generally asserts that he still has a mental illness and deserves treatment but makes no constitutional challenge to the statute and alleges no specific claim as to any right for continued sex offender treatment to continue advancement in TCCC's tier system; and (3) asserts he was depressed and suicidal as a result, the undersigned construes Welsh's Complaint and questionnaire responses to be asserting a deliberate indifference claim, and only considers it as such. *See supra* note 5.

mental disease" and requesting treatment (Compl. 23); however, he does not allege that he made Maddox aware that CPC would not treat him and that he was depressed and suicidal as a result. As such, Welsh has not established that Maddox was sufficiently involved to have disregarded a substantial risk of serious harm. *See Bohannan v. Doe*, 527 F. App'x 283, 292 (5th Cir. 2013) (per curiam) (affirming dismissal of denial of medical care claim because plaintiff "only cursorily mention[ed] [defendants] . . . in his pleadings" and did "not allege[] sufficient facts to demonstrate a deliberate indifference to [his] medical needs"); *Chapman v. Tucker*, No. 3:11-cv-60-HTW-LRA, 2013 WL 5445285, at *4 (S.D. Miss. Sept. 30, 2013) (concluding sheriff was not deliberately indifferent because he was not personally involved in plaintiff's care; plaintiff "simply wrote him several letters").

Welsh's claim against Administrator Diaz[24] should also be dismissed. Welsh admits that when asked, Diaz scheduled him for an appointment with a mental health provider. Compl. 23. According to Welsh, the CPC then "informed [him] that they do not treat his type of mental illness." *Id.* Welsh purportedly "informed Diaz . . . verbally and in writing that [CPC] . . . do[es] not treat his type" of illness and "that he need[ed] an alternat[e] treatment provider." *Id.* Despite his contradictory assertion that Diaz responded by claiming "they are not required to give him treatment" because of his specific mental disease, Welsh admits that Diaz continued to schedule counselling appointments with CPC. *Id.* As a result, Welsh maintains that due to a lack of treatment, he became depressed and suicidal; however, he alleges no facts demonstrating that he advised Diaz of either condition, or that CPC independently communicated to Diaz that they could provide no effective treatment for Welsh. *See id.*

---

[24] Welsh pleads no facts demonstrating Diaz possesses any medical education, training, or qualification, apparently simply contending that in her role as Jail Administrator, she should have procured an alternative form of treatment.

Courts necessarily draw a distinction between medical deliberate indifference claims asserted against laypersons versus medical practitioners, generally observing that once a referral is made, the layperson's "responsibility . . . [is] to defer to the findings of the medical personnel." *Roberts v. Lessard*, 841 F. App'x 691, 695 (5th Cir. 2021) (per curiam). Here, Administrator Diaz referred Welsh for mental health treatment on multiple occasions in response to his specific request. Moreover, "disagreements about medical treatment generally are insufficient to establish a constitutional violation," i.e., deliberate indifference. *Hendrix v. Lloyd Aschberger, P.A.*, 689 F. App'x 250, 250 (5th Cir. 2017) (per curiam); *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). Even assuming Administrator Diaz was constitutionally responsible for the level of treatment provided to Welsh by a third party, the failure to deliver a requested treatment, while providing an alternative but "ineffective" one, "has been classified as a disagreement with the treatment provided and such allegations are insufficient to show a constitutional violation." *Washington v. Lavespere*, No. 18-273-BAJ-RLB, 2019 WL 1465342, at *3 (M.D. La. Feb. 15, 2019) (citing *Hendrix*, 689 F. App'x at 250), *R. & R. adopted by* 2019 WL 1460886 (M.D. La. Apr. 2, 2019); *see Lowe v. Davenport*, 442 F. App'x 955, 956 (5th Cir. 2011) (per curiam) (affirming lower court's dismissal as frivolous § 1983 deliberate indifference medical claim where prisoner did not allege TDCJ unit mental health practice manager "had any authority to prescribe medications or to direct [clinical nurse] to prescribe medications," and noting, at best, prisoner alleged only that he disagreed with treatment he did receive and that it was ineffective).

Welsh has also failed to plead facts showing that Diaz knew he had a serious medical need and refused to treat it. Although Welsh claims *CPC told him* it does not treat his type of illness, he makes no allegation that CPC communicated this information *to Diaz. Cf. Lawson v. Dallas Cnty.*, 286 F.3d 257, 263 (5th Cir. 2002) (affirming district court's conclusion that jail officials

47

were deliberately indifferent because "despite their actual knowledge of the seriousness of [plaintiff's] condition," they refused to follow doctors' instructions to provide him with additional care). Moreover, even assuming *Welsh told Diaz* CPC could not treat him, he nevertheless makes no assertion that he told Diaz he was depressed and suicidal due to the purported lack of mental health treatment, thus failing to show she was subjectively aware of a serious risk of substantial harm.[25] *See Converse v. City of Kemah*, 961 F.3d 771, 775 (5th Cir. 2020) (acknowledging "that pretrial detainees have a Fourteenth Amendment right to be protected from a known risk of suicide," which is violated if officials "gained *actual* knowledge of the substantial risk of suicide and responded with deliberate indifference" (emphasis added) (quoting *Hare*, 74 F.3d at 650)); *Est. of Munoz ex rel. Ruelas v. Ford*, 402 F. Supp. 3d 344, 354 (E.D. Tex. 2019) (finding plaintiff "fail[ed] to allege that any [d]efendant acted with deliberate indifference" where, despite "stat[ing] in a conclusory fashion that [d]efendants 'kn [ew] [he] was possibly suicidal and not feeling well,'" plaintiff did not establish they were "aware of a substantial risk that [he] would attempt suicide" (emphasis omitted)); *Jason v. Hedgemon*, No. 3:21-CV-03405, 2023 WL 3333627, at *9 (W.D. La. Apr. 21, 2023) (explaining warden was not deliberately indifferent despite plaintiff's lack of psychological treatment because the messages plaintiff sent the warden requesting medical care "lack[ed] any specificity to place [him] on notice that [plaintiff] was at risk of *serious* harm"), *R. & R. adopted by* 2023 WL 3325916 (W.D. La. May 9, 2023).

For these reasons, the undersigned recommends the district judge dismiss Welsh's claims that Sheriff Maddox and Administrator Diaz were deliberately indifferent to his medical needs.

---

[25] The Court acknowledges that "inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation." *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999). But Welsh's failure to communicate any information to Diaz such that she had actual knowledge of a substantial risk of harm, along with the fact that she is not a medical professional, amounts to a claim for negligence—not deliberate indifference. *See id.* at 533–34 (explaining that inadequate medical care amounts to a constitutional violation when "the official *knows of and disregards* an excessive risk to inmate health or safety" (citation omitted)).

### F. Procedural Due Process

Welsh generally asserts that the following incidents give rise to procedural due process violations: (1) Deputy Garza forced him to sign a disciplinary waiver form and denied Welsh notice or the opportunity to rebut the disciplinary charges; (2) Lamb County denied him internet access and the ability to express his opinion in the Texas Supreme Court election; (3) Lamb County and Sheriff Maddox switched its cable system and denied him a radio and video games without giving Welsh a chance to speak on his entitlement to such things; (4) Lamb County, Administrator Diaz, Sheriff Maddox, and Deputies Klatt, Armstrong, and Cotton forced him to attend a medical appointment even after he refused; (5) Administrator Diaz confiscated his commissary items even though they were purchased before his restrictions began;[26] (6) Administrator Diaz, Sheriff Maddox, and Lamb County rejected his newsletters without notice; and (7) Lamb County, Sheriff Maddox, and Administrator Diaz did not give him the opportunity to show his entitlement to his mail.[27]

Welsh claims that Defendants subjected him to punitive conditions without due process. *See id.* As a pretrial detainee, Welsh's claims are governed by the Fourteenth Amendment, which prohibits punishment without due process of law. *Bell*, 441 U.S. at 535–36; *see Hare*, 74 F.3d at

---

[26] Welsh believes that a commissary restriction should only prevent him from purchasing commissary items, not possessing them; but he agrees Jail personnel explained that a commissary restriction prevents him from possessing any commissary purchases, and that his property would be returned to him in fifteen days. Questionnaire 9. Thus, Welsh's wrongful confiscation claim presents a mere disagreement over what a commissary restriction means. A claim that Diaz misinterpreted the meaning of the Jail's commissary restriction policy by taking already purchased property fails because violations of jail policy in and of themselves cannot form the basis of a § 1983 claim. *Myers*, 97 F.3d at 94. Moreover, Welsh's challenge to Diaz taking his property fails because it appears that his property was returned to him, but if it was not, Welsh has an adequate post-deprivation remedy in state law for any taking of his personal property in violation of jail policy. *See infra* II.F.2. (discussing Welsh's remedy for similar property taking claim).

[27] Welsh brings several causes of action based on one set of facts without fully explaining the constitutional bases for each claim. While the undersigned has already recommended dismissal of these claims based on other grounds (*see supra* Sections II.C., II.D., II.E.), because Welsh explicitly lists these claims under the "Counts" section of his Complaint as procedural due process or Fourteenth Amendment claims in addition to First Amendment, etc. claims, the undersigned must additionally consider whether the facts pleaded demonstrate a procedural due process violation. Compl. 24–27.

639 (explaining that a pretrial detainee's rights "flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment").

While Welsh contends these situations violated his procedural due process rights, only his claims regarding his disciplinary proceedings, rejection of newsletters, and mail present non-frivolous claims and thus the undersigned does not address the other claims.[28]

### 1. Disciplinary Waiver

Welsh alleges Deputy Garza violated his procedural due process rights by forcing Welsh to sign a disciplinary proceedings waiver under duress and denying him his right to notice of the factual allegations against him and a disciplinary hearing.

On October 6, 2020, Welsh alleges Deputy Garza came to his cell with a form asking Welsh to waive disciplinary proceedings and accept reduced sanctions. Compl. 6.[29] Welsh requested information regarding the factual allegations and charge against him, but Garza "refused to give him any information other than the title of the rule violation." *Id.* Welsh attended a disciplinary hearing on October 13, 2020, during which he "protested that [he] did not receive notice of the statements made against [him], the complaining" officer's name, or any factual allegations. *Id.* Afterwards, Welsh "sign[ed] the waiver under duress." *Id.* at 7. Authenticated records show that the charge was based on Welsh's behavior on October 5, 2020, when Welsh began yelling obscenities and threw his food tray at the cell door and ceiling multiple times, resulting in damage

---

[28] "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972). Welsh has not established a liberty or property interest in having internet access or cable and radio. *See, e.g., Baity v. Williams*, No. 2:15-CV-16, 2015 WL 3965280, at *2 (N.D. W. Va. June 29, 2015) (concluding that plaintiff's due process claim failed "because a prisoner does not have liberty interest in . . . computer privileges" (citing *Solan v. Zickefoose*, 530 F. App'x 109, 111 (3d Cir. 2013) (per curiam)); *Manley*, 945 F. Supp. at 134 ("Plaintiffs offer no colorable argument . . . that they have a liberty or property interest in the retention of television and radio access."). In addition, as previously discussed, Welsh's claim related to his ability to refuse medical treatment is refuted by video evidence. *See supra* note 19.

[29] *See supra* notes 2 and 3, for the Court's detailed construction of Welsh's allegations concerning this claim.

to the food tray and Welsh being charged with destruction of property, throwing/propelling objects, and interference with security operations. Questionnaire 7. Welsh denies yelling obscenities and damaging the food tray but otherwise does not dispute these events. *Id.* Records also show that the disciplinary hearing on October 13 was cut short because Welsh became upset and stated that he had wanted to sign the waiver form when Garza originally presented it. *Id.* After Welsh signed the waiver form, he was given fifteen days of restrictions beginning on October 13. *Id.*

Before receiving punishment for a disciplinary infraction, a detainee is entitled to certain procedural protections. *Wolff v. McDonnell*, 418 U.S. 539, 563–66 (1974). Welsh, however, concedes that he engaged in at least some of the behavior that resulted in the disciplinary charge, conviction, and premature termination of the hearing, e.g., throwing his food tray at the cell door and ceiling multiple times. *See* Questionnaire 7. He further agrees that he signed the disciplinary waiver, albeit he contends it was under duress because he "was told that if [he] did not sign he . . . would not be able to know the statements made against [him], call witnesses . . . , or present [his] medical records at the hearing." *Id.* at 8. Despite his coercion claim, Welsh admits that he became upset at his disciplinary hearing in part because he originally *wanted to sign the waiver form* on October 6, but Garza did not return to his cell within 24 hours. *Id.* at 7. Thus, even liberally construing Welsh's assertions, the Court is not required to accept as true his contradictory allegations that he was both forced to sign the waiver under duress but also wanted to sign it. *See Mora v. Univ. of Tex. Sw. Med. Ctr.*, 469 F. App'x 295, 299 (5th Cir. 2012) (per curiam) (noting that a claim that was contradicted by other facts alleged in the complaint made it "implausible on its face"); *LaRoe v. Blue Cross Blue Shield of Tex.*, No. 3:03-CV-2381-K, 2004 WL 1585842, at *1 (N.D. Tex. July 13, 2004) (recognizing that a "court need not accept as true conclusory or inferential allegations which are contradicted by the facts pleaded").

51

Moreover, because Welsh concedes that he engaged in some of the activity supporting the disciplinary charge—i.e., that he threw his food tray at the cell door and ceiling multiple times—his resulting conviction was based on "some evidence" and sufficient to satisfy due process, despite his duress claim. *See Arguello v. English*, No. 5:15cv145/LAC/EMT, 2016 WL 1580269, at \*6 (N.D. Fla. Mar. 18, 2016) (finding plaintiff's due process rights were not violated by disciplinary conviction despite allegation that he only stated he was guilty under duress, in part because there was sufficient evidence to support the conviction), *R. & R. adopted by* 2016 WL 1574087 (N.D. Fla. Apr. 18, 2016); *Banuelos*, 41 F.3d at 234 (considering only whether the disciplinary conviction was supported by some evidence and concluding it was because plaintiff admitted to much of the charged conduct); *Swafford v. Cain*, No. 13-0788-JWD-RLB, 2014 WL 4418537, at \*4 (M.D. La. Sept. 8, 2014) (recommending dismissal at screening of plaintiff's due process claims because he did not dispute all of the factual assertions in the disciplinary charge, and thus it appeared there was some evidence to support the guilty finding).

As such, Welsh's procedural due process claim related to signing the waiver and his disciplinary hearing and charge should be dismissed for failure to state a claim.

### 2. *Entitlement to Mail*

Welsh claims that Administrator Diaz, Sheriff Maddox, and Lamb County[30] denied him access to his mail on the KIOSK system without the opportunity to show his entitlement to his mail.

On January 27, 2022, Welsh claims "Lamb County took all of [his] electronic e-mails and recorded text messages sent through the KIOSK machine." Compl. 18. Welsh contends he was not provided notice or a hearing, and Lamb County refused to provide hard copies of his mail. *Id.*

---

[30] Welsh's claims against Lamb County for denying him access to his KIOSK mail are discussed *infra* in Section II.I.1.

Welsh informed Diaz and Maddox and they apparently "determined that Welsh [does] not have a right to a hard copy." *Id.* at 19. Welsh asserts this violated his procedural due process rights because he has a "right to argue [his] entitlement to the messages."[31] Questionnaire 21.

"[A] prisoner has a protected liberty interest in communication by mail." *Boyd v. Bureau of Prisons*, No. 3:21-cv-1004-G (BT), 2022 WL 3904980, at *7 (N.D. Tex. Aug. 8, 2022), *R. & R. adopted by* 2022 WL 3925374 (N.D. Tex. Aug. 30, 2022). "Inmates are entitled to procedural due process in connection with the denial of mail, including notice and an opportunity to be heard." *Schwarzer*, 2021 WL 6060002, at *2. "[B]oth senders and addressees are entitled to certain procedural due process protections" and "have a liberty interest in uncensored communication." *Abshire*, 852 F. App'x at 154.

Welsh, however, does not claim that his ability to communicate was cut off through these actions or that his incoming mail was rejected. He also does not allege any specific facts demonstrating mail interference or denial of access to the courts. *See* Compl. 18–19 (focusing only on officials' alleged taking of his property, rather than a denial of access to legal mail or prejudice suffered as to his ability to pursue a non-frivolous legal claim). Instead, Welsh merely claims that mail that he had already sent or received was "taken," and Lamb County would not

---

[31] Welsh also claims this violated his substantive due process rights. Mail censorship or interference with a detainee's legal mail (*Brewer v. Wilkinson*, 3 F.3d 816, 820 (5th Cir. 1993)) may violate a detainee's First Amendment rights. *Schwarzer v. Wainwright*, No. 19-41011, 2021 WL 6060002, at *2 (5th Cir. Dec. 17, 2021); *see also Jackson v. Procunier*, 789 F.2d 307, 310–11 (5th Cir. 1986) (recognizing a substantive due process right to access to the courts). In addition, "[t]he alleged failure to notify [plaintiff] of the rejection of his *incoming* mail and to give him an opportunity to appeal the decision . . . state[s] a valid claim for a violation of Fourteenth Amendment procedural due process." *Abshire v. Mailroom*, 852 F. App'x 153, 154 (5th Cir. 2021) (per curiam) (emphasis added). The undersigned, however, has not located a case analyzing allegations based on denial of access to already sent or received non-legal mail under *substantive* due process—or any cause of action, for that matter—and thus, the undersigned recommends the district judge dismiss this claim.

provide hard copies for Welsh.[32]  As such, Welsh's claim should be construed as a property deprivation claim.

Generally, an official's random, unauthorized actions—whether negligent or intentional—that result in a loss of property constitute a state tort action rather than a federal due process claim, unless the state fails to provide an adequate post-deprivation remedy. *See Allen v. Thomas*, 388 F.3d 147, 149 (5th Cir. 2004) (quoting *Zinermon v. Burch*, 494 U.S. 113, 115 (1990)); *Carmona v. Branstuder*, No. 95-30190, 1995 WL 581807, at *1 (5th Cir. 1995) (per curiam).  This principle is known as the *Parratt/Hudson* doctrine.[33]   *Allen*, 388 F.3d at 149.   Courts apply the *Parratt/Hudson* doctrine where the following three prerequisites are satisfied:  (1) the deprivation must be unpredictable or unforeseeable; (2) "predeprivation process [must] be impossible, making any additional safeguard useless"; and (3) the state actor's conduct must have been "unauthorized" in the sense that it was not within the officials' express or implied authority.  *Charbonnet v. Lee*, 951 F.2d 638, 642 (5th Cir. 1992) (citing *Zinermon*, 494 U.S. at 136–38); *Caine v. Hardy*, 943 F.2d 1406, 1413 (5th Cir. 1991) (en banc).

Each of the preconditions identified in *Zinermon* is present here.  First, the purported deprivation was unpredictable and unauthorized.  Welsh alleges the KIOSK service where mail was stored was abruptly stopped, causing Lamb County to intentionally "take" his mail, but he pleads no facts showing such action was taken pursuant to Jail policy.  Compl. 18; Questionnaire 21 (contending the service was shut off "without warning"); *see Washington v. Garcia*, No. 2:19-

---

[32] Welsh's vague assertions suggest that he lost access to copies of previously sent text messages and emails "due to stoppage" of the service.  Compl. 18.  Welsh describes this lack of access as a taking.  *See id.* at 18–19.  Welsh's pleadings are unclear as to whether the term "copies" references electronic and/or paper versions of the messages and emails, and at what point in time the access was denied.  In either case, as described *infra*, Welsh pleads no facts demonstrating that access to the copies was denied in accordance with Jail policy, as opposed to random or unauthorized actions directed at him alone.

[33] *Hudson v. Palmer*, 468 U.S. 517 (1984); *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327, 330–31 (1986).

CV-131-Z-BR, 2022 WL 3702011, at *2 (N.D. Tex. Aug. 26, 2022) (explaining that defendant's allegedly intentional damage to plaintiff's property was random and unauthorized because plaintiff did not allege there was a prison policy that allowed for intentional destruction of property); *Williams v. Becraft*, No. 6:16cv1379, 2019 WL 13423727, at *2 (E.D. Tex. July 24, 2019) (concluding that plaintiff's "allegations that officers were acting with 'evil intent,' 'stealing,' and taking items that they were not authorized to take," confirmed that their actions were random and unauthorized).

Finding that the intentional taking of Welsh's mail was random and unauthorized, it naturally follows that a predeprivation process was neither available nor feasible. *See 3601 Camp St., LLC v. Orleans Par. Sch. Bd.*, No. 15-290, 2015 WL 4661785, at *5 (E.D. La. Aug. 5, 2015) (observing that where the nature of the intentional taking is unpredictable, such a scenario gives rise to the question of "how a predeprivation hearing would be possible," especially considering "plaintiff's fail[ure] to persuasively argue, let alone allege, how [one] would be feasible"); *see also Caine*, 943 F.2d at 1412 ("The genesis of *Parratt/Hudson* lay in the insight that 'the State cannot be required constitutionally to do the impossible by providing predeprivation process' to stem aberrant, unpredictable conduct.").

Applying the doctrine to the circumstances presented herein, Welsh cannot establish a cognizable procedural due process claim unless the state fails to provide an adequate post-deprivation remedy. *Carmona*, 1995 WL 581807, at *1. Texas substantive law provides an adequate post-deprivation remedy for persons asserting claims such as those raised herein by Welsh—pursuing a conversion claim in state court. *See, e.g.*, *Murphy v. Collins*, 26 F.3d 541, 543 (5th Cir. 1994). Thus, Welsh cannot maintain a cognizable federal cause of action. *See DeMarco v. Davis*, 914 F.3d 383, 387 (5th Cir. 2019) (affirming dismissal of prisoner's claim that defendant

seized his religious materials in violation of TDCJ policy because "Texas's tort of conversion provides an adequate post-deprivation remedy for prisoners claiming loss of property without due process"). The undersigned therefore recommends the district judge dismiss Welsh's due process claim based on Sheriff Maddox and Administrator Diaz's alleged denial to provide hard copies of or electronic access to Welsh's mail.

### 3. Newsletters

Welsh contends Sheriff Maddox, Administrator Diaz, and Lamb County[34] violated his procedural due process rights when they rejected his incoming newsletters without providing him with notice of the rejection and an opportunity to object.

Welsh claims that he ordered six Prison Legal News newsletters but only received one because they were considered contraband. Compl. 4. He claims these were confiscated "without ever delivering the mail to Welsh," thus apparently attempting to state a procedural due process claim. *Id.* at 24.

As discussed above, Welsh is "entitled to certain procedural protections, including notice of rejected mail and an opportunity to be heard." *Abshire*, 852 F. App'x at 154. "The alleged failure to notify [Welsh] of the rejection of his incoming mail and to give him an opportunity to appeal the decision appears to state a valid claim for a violation of Fourteenth Amendment procedural due process." *Id.* (citation omitted). Welsh claims that he never received his newsletters and was not notified until months later when he asked Administrator Diaz and Sheriff Maddox where they were and why they had been confiscated.[35] Compl. 4. As such, the

---

[34] Welsh's claims against Lamb County for denying him due process after confiscating his newsletters are discussed *infra* in Section II.I.2.

[35] Welsh does not specifically allege that Maddox and/or Diaz are responsible for the confiscation (*see* Compl. 4); however, based on Welsh's assertions that when confronted, Diaz said "[Welsh] could not prove [she and Maddox] took the paper," and Maddox stated "the papers were considered contraband by his policy," the undersigned liberally construes Welsh's allegations as contending that they confiscated his papers pursuant to policy without notifying him.

undersigned finds Welsh has stated a plausible claim at screening and recommends the district judge order Administrator Diaz and Sheriff Maddox to answer as to the alleged procedural due process violation.[36]

### G. Sherman Act

Welsh brings claims against Lamb County, Sterling Corporation, and Prodigy Services under the Sherman Act for conspiring to inflate phone and commissary prices.

Welsh alleges that the Jail "inflate[s] and price gauge[s] Welsh at a rate of twenty cents a minute and has . . . a monopoly over the phone services." *Id.* at 14. These rates are allegedly "set to punish by increasing the burden upon Welsh to exercise" these rights. *Id.* at 15. Welsh avers the Jail and the phone provider, Sterling, "conspire to price gauge him . . . so they can profit share under their agreed contract." *Id.* Similarly, Welsh asserts that the Jail and the commissary provider, Prodigy Services, "conspire to price gauge [sic]." *Id.*; Questionnaire 27. He contends Lamb County accomplishes this by "exclud[ing] by contract any outside competitor" and choosing "the one provider that mark-up [sic]." Questionnaire 27. Welsh appears to allege that Lamb County conspired with both Sterling and Prodigy Services to fix prices and monopolize phone and

---

[36] Welsh's claim that he was deprived of notice and the opportunity to be heard regarding Defendants' purported refusal to allow delivery of already ordered newsletters should not be barred by claim splitting. Unlike his First Amendment claims, which dealt with Diaz and Maddox's purported policy of denying Welsh *the ability to order outside publications*, this claim focuses on the alleged constitutional failures that occurred *after a publication was ordered and shipped* to the Jail. In case number 5:20-cv-024, Welsh claimed that due to the Jail's blanket ban on ordering books, he was never allowed to order anything and have it shipped to the Jail. Thus, Welsh could not have raised this claim in case number 5:20-cv-024. *See generally Welsh v. Lamb Cnty.*, No. 5:20-cv-00024-H, Am. Compl.; *see also id.* at ECF No. 93, at 25 (concluding there was "a genuine issue of material fact as to whether Lamb County banned receipt of all outside books and publications" as a policy or practice of the county). Because these claims do not relate to the book policy denying Welsh *the ability* to order books and other publications, they are not based on the same nucleus of operative fact. *See Johnson*, 444 F. App'x at 32 (concluding claims were not precluded by previous lawsuits in part because while both "challenge[d] the propriety of [the police department's] policies, each challenge[d] a *different policy*"). The undersigned therefore recommends the district judge find this claim not barred by claim splitting and allow it to move forward.

commissary services.[37]  The undersigned thus analyzes Welsh's allegations under Sections 1 and 2 of the Sherman Act, or 15 U.S.C. §§ 1, 2.

"Section 1 of the Sherman Act forbids contracts, combinations, or conspiracies in restraint of trade or commerce," while "Section 2 . . . establishes a cause of action against [those] . . . that monopolize, or attempt to monopolize, or conspire to monopolize, 'any part of the trade or commerce . . . .'"  *Salts v. Moore*, 107 F. Supp. 2d 732, 741, 743 (N.D. Miss. 2000) (quoting 15 U.S.C. § 2).  To establish a Section 1 violation, a plaintiff must show that defendants: "(1) engaged in a conspiracy (2) that produced some anti-competitive effect (3) in the relevant market."  *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 327 (5th Cir. 2015) (quoting *Johnson v. Hosp. Corp. of Am.*, 95 F.3d 383, 392 (5th Cir. 1996)).  An illegal monopolization claim under Section 2 requires showing: "(1) the possession of monopoly power in the relevant market, and (2) 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'"  *United States v. Am. Airlines, Inc.*, 743 F.2d 1114, 1117 (5th Cir. 1984) (citation omitted).

Welsh's conclusory claims regarding Lamb County's conspiracy to fix prices with the phone and commissary providers fail to state a claim.  "To satisfy the first element, pleadings must contain charges of the defendants' conspiracy and factual allegations that would support such a

---

[37] The undersigned notes that this claim is similar to Welsh's claim that Lamb County inflates its phone prices in violation of his First Amendment rights, which as discussed above, is precluded by res judicata. *See supra* Section II.C.4.  While this appears to be a separate claim against the same party (i.e., Lamb County) on the same facts, it is not barred by res judicata or claim splitting—Welsh attempted to bring this claim in case number 5:20-cv-024, but was denied leave to amend. *See Welsh v. Lamb Cnty.*, No. 5:20-cv-00024-H, ECF No. 30, at 31 (denying as futile Welsh's request to supplement his Amended Complaint with antitrust claims). "[Welsh] cannot be barred on the theory that []he should have brought [this] claim in [the previous case] when []he attempted to do so, and leave to amend was denied. [H]e did what the rule against splitting causes of action encourages [him] to do . . . ." *Nilsen v. City of Moss Point*, 674 F.2d 379, 385–86 (5th Cir. 1982); *see cf. Anderson*, 90 F. Supp. 3d at 672 (finding plaintiff could have brought claim because she was not denied leave to amend her complaint).

claim"—Welsh's Complaint contains nothing but general assertions of conspiracy and price-fixing. *Ancar v. Sara Plasma, Inc.*, 964 F.2d 465, 469 (5th Cir. 1992). He also fails to allege any effect on interstate commerce. *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 893 (N.D. Ill. 2009) ("A jurisdictional prerequisite to [a Section 1] claim is that defendants' activities affect interstate commerce . . . .").

Welsh's broad monopoly claims similarly fail to state a claim under Section 2. Welsh does not include facts supporting any of the elements laid out above and appears to assert that Lamb County conspired to create a monopoly based on (1) their choice of a provider that charges more than others and (2) the detainees' inability to choose otherwise. Such claims do not show an anti-trust violation. *See Pate v. Precythe*, No. 2:22-cv-00050-NAB, 2022 WL 5075083, at *6 (E.D. Mo. Oct. 4, 2022) (dismissing plaintiff's Section 2 claim where he merely asserted that his correctional institution was price fixing because the price of toothbrushes was too high, without offering supporting facts to establish the elements (citing *Johnson v. South Dakota*, No. 4:17-CV-04026-LLP, 2017 WL 1967362, at *2 (D.S.D. May 10, 2017) (finding plaintiff failed to state a claim because he did "not make any allegations concerning [the facility's] market share or . . . the relevant market" or that the facility "contracted with [the provider] because [it] ha[d] a dominant market share of that market"))).

Thus, the undersigned recommends the district judge dismiss Welsh's Sherman Act claims against Lamb County, Sterling Corporation, and Prodigy Services for failure to state a claim.

## H. Texas Constitution

Welsh asserts claims under the Texas Constitution against Sheriff Maddox and Lamb County for allegedly making rules and punishing Welsh without legislative or judicial authority.

Welsh alleges Lamb County does not have authority to "impose sanctions or promulgate rules for the jail administrations and function." Questionnaire 10; Compl. 7–8. In Welsh's view, Lamb County violated the Texas Constitution's separation of powers provision in doing so because it is not a legislative body or the judiciary, and thus cannot enact rules or impose punishment. Questionnaire 10.

Welsh's claim that Lamb County and Sheriff Maddox are without authority to make rules and discipline detainees because it violates separation of powers under the Texas Constitution should be dismissed as frivolous. It is well established that jails may make rules and issue disciplinary infractions to inmates who break those rules. "Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547, 562 (explaining that prison administrators are the experts in maintaining institutional security and cautioning courts against becoming "enmeshed in the minutiae of prison operations"); *see also Mounce v. Doe*, No. 12-669, 2014 WL 2587698, at *12 (E.D. La. June 10, 2014) ("Sheriff . . . is ultimately responsible for all administrative functioning at the . . . [j]ail.").

Because Welsh's claim that the Jail is without authority to maintain its orderly function is not viable, the undersigned recommends the district judge dismiss as frivolous this claim against Lamb County and Sheriff Maddox.

## I.  Policy Claims

Welsh brings claims against Lamb County based on its policies related to receiving outside publications, hours of exercise allowed, the Jail's uniforms, internet access, switching the cable system, denying him a radio and video games, the commissary and phone rates, unlawful restraint/

excessive force, denying him access to his KIOSK mail, Jail operations that result in sleep deprivation, promulgating rules and punishing detainees without authority, and the ability to refuse a medical appointment.

"A municipality is a 'person' subject to suit under Section 1983." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 166 (5th Cir. 2010) (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978)). A municipality cannot, however, "be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. Instead, "the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001); *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) ("The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." (emphasis in original)).

In other words, Welsh must "show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. Of Cnty. Comm'rs of Bryan Cnty. V. Brown*, 520 U.S. 397, 404 (1997). "[T]he burden for establishing municipal liability under § 1983 is stringent." *Good v. City of Irving*, No. 3:06-CV-2133-K, 2009 WL 804701, at *8 (N.D. Tex. Mar. 26, 2009). Welsh must demonstrate: "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002). The principal agent or policymaker must have actual or constructive knowledge because "[a]ctions of

officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy." *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (per curiam).

### 1. Underlying Constitutional Violation

"To establish a county's liability on a § 1983 claim, a plaintiff must show that the County had some inadequate custom or policy that acted as the moving force behind a constitutional violation." *Forgan v. Howard Cnty.*, 494 F.3d 518, 522 (5th Cir. 2007) (citing *Monell*, 436 U.S. at 690–91). Thus, a plaintiff must allege an underlying constitutional violation as a necessary prerequisite to pleading a successful municipal liability claim. *Hicks-Fields v. Harris Cnty.*, 860 F.3d 803, 808 (5th Cir. 2017).

All but two of Welsh's policy claims fail because, as discussed, Welsh has not stated a constitutional violation related to his exercise and clothing,[38] internet access, switching the cable system, denying him a radio and video games, the commissary and phone rates, unlawful restraint/excessive force, denying him access to his KIOSK mail, promulgating rules and punishing detainees without authority, and the ability to refuse a medical appointment claims. *Taylor v. Hale*, No. 3:07-CV-1634-L, 2008 WL 4449502, at *8 (N.D. Tex. Sept. 30, 2008) ("[E]ven if [p]laintiff were to adequately set forth an unconstitutional policy or custom, his claim fails as a matter of law because the court has found that there is no underlying constitutional violation."); *Campbell v. Harris*, No. 3:96CV3220L, 2000 WL 349746, at *8 (N.D. Tex. Mar. 31, 2000) ("When there is no underlying constitutional violation, the policy becomes irrelevant and is 'quite beside the point.'" (quoting *Los Angeles v. Heller*, 475 U.S 796, 799 (1986)), *aff'd*, 31 F. App'x 152 (5th Cir. 2001). Thus, the undersigned recommends that the district judge dismiss

---

[38] Discussed *infra* Section II.I.3.a.

Welsh's claims related to Lamb County's purported policies concerning exercise and clothing, internet access, cable channels, radio, video games, the commissary and phone rates, unlawful restraint/excessive force, denying him access to his KIOSK mail, promulgating rules and punishing detainees without authority, and ability to refuse medical treatment.

### 2. Books and Newsletter Policy

Welsh's claim that Lamb County has an official policy or custom of denying all book orders and outside publications, in violation of his First Amendment rights, should be dismissed based on the notion of claim splitting.

As discussed above, Welsh cannot maintain a claim based on Sheriff Maddox's and Administrator Diaz's refusal to allow Welsh to order any books because they should be barred by claim splitting. *See supra* Section II.C.1. Welsh also previously asserted this as a policy claim against Lamb County in case number 5:20-cv-024. *See Welsh v. Lamb Cnty.*, No. 5:20-cv-00024-H, Am. Compl. 20–21 (contending Lamb County violated his First Amendment rights through its policy, practice, and custom, implemented by Maddox, Diaz, and others, by "denying [Welsh] his rights to purchase a book"). Thus, for the reasons stated above this is the same claim arising from the same nucleus of operative fact. *See supra* Section II.C.1.; *see also Stuart v. City of Scottsdale*, No. CV-17-01848-PHX-DJH (JZB), 2024 WL 1299643, at *9 (D. Ariz. Mar. 27, 2024) (explaining the same claim element was met because the *Monell* claim, "although based on additional facts . . . relie[d] on the same nucleus of facts that partly underpinned" plaintiff's previous *Monell* claims that defendants had a custom of retaliating when plaintiff exercised his free speech rights). Lastly, because he sued Lamb County in case number 5:20-cv-024 and in the instant case, the same party element is also met. *See Harmon v. Dallas Cnty.*, 248 F. Supp. 3d 814, 821 (N.D. Tex. 2017)

(determining the same party or privity requirement was met because the county was sued in both actions), *aff'd*, 927 F.3d 884 (5th Cir. 2019).

To the extent Welsh intends to bring a separate policy claim based on his assertions that he was denied notice and the opportunity to object to his newsletters being confiscated, however, those claims should be dismissed for failure to state a claim.

As previously discussed, Welsh's claim that Sheriff Maddox and Administrator Diaz confiscated his newsletters without notifying and giving him an opportunity to object are not barred by claim splitting. *See supra* Section II.F.3. & n.36. It follows that any policy claim based on the same underlying facts is also not precluded. Thus, the undersigned addresses the merit of any claim that Lamb County has a policy of denying the requisite process when rejecting a detainee's mail.

Welsh alleges, in isolation, that the Jail confiscated his newsletters without notice. *See* Compl. 4 (contending he did not receive five out of six newsletters he ordered). Welsh, however, fails to allege any facts showing that Lamb County has a policy or practice of denying inmates notice and the opportunity to object to mail confiscation or rejection. *See id.*; *see also* Questionnaire 3–4 (providing policy-related facts only in connection with Welsh's claim that the Jail has a policy of denying inmates the ability to *order* publications).

Thus, Welsh's policy claims fail because he is trying to hold Lamb County responsible for its employees' individual actions without establishing any official policy or custom that is the moving force behind a constitutional violation. *Holley v. Italy Indep. Sch. Dist.*, No. 3:23-cv-1239-BN, 2024 WL 1396275, at *5 (N.D. Tex. Mar. 31, 2024) ("Municipalities are not liable on the theory of respondeat superior and are almost never liable for an isolated unconstitutional act on the part of an employee." (quoting *Hutcheson v. Dallas Cnty.*, 994 F.3d 477, 482 (5th Cir.

2021))). Moreover, the relatively limited number of instances alleged are insufficient for establishing a practice or custom adequate to show the existence of a Lamb County policy related to mail confiscation. *See Peterson v. City of Fort Worth*, 588 F.3d 838, 850–51 (5th Cir. 2009) ("A pattern . . . requires 'sufficiently numerous prior incidents,' as opposed to 'isolated instances.'" (quoting *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989))); *Martinez v. Nueces Cnty.*, 71 F.4th 385, 391 (5th Cir. 2023) (noting that a policy can be shown "via a pattern that has 'occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body,'" but that plaintiff's complaint did not "clear this bar" (citation omitted)); *Carter v. Diamond URS Huntsville, LLC*, 175 F. Supp. 3d 711, 733 (S.D. Tex. 2016) ("A plaintiff cannot conclusorily allege a policy or a custom and its relationship to the underlying constitutional violation; instead the plaintiff must plead specific facts." (quoting *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997))).

Because Welsh fails to identify a Lamb County policy or establish a practice or custom of Lamb County that caused the alleged constitutional violations, and merely complains of Lamb County employees' individual actions, he fails to state a claim under *Monell*. *Jenkins v. LaSalle Sw. Corr.*, No. 3:17-cv-1376-M-BN, 2018 WL 3748196, at *8 (N.D. Tex. July 11, 2018) (recommending dismissal of plaintiff's *Monell* claim where the "alleged constitutional violations [were] isolated to him"), *R. & R. adopted by* 2018 WL 3743945 (N.D. Tex. Aug. 7, 2018); *see Brown v. Tarrant Cnty.*, 985 F.3d 489, 497 & n.11 (5th Cir. 2021) (noting that the court "need not consider whether [plaintiff's] claim also fail[ed] the other two *Monell* prongs" because he did not identify a policy or custom). As such, the undersigned recommends the district judge dismiss Welsh's claim that Lamb County denied him procedural due process after confiscating his newsletters for failure to state a claim.

In sum, the undersigned recommends the district judge dismiss Welsh's claims that Lamb County maintains a policy of (1) denying all outside books and publications as barred by claim splitting, and (2) not providing inmates with the requisite process after confiscating their mail for failure to state a claim.

### 3. *Conditions of Confinement*

Welsh alleges that Lamb County maintains policies at the Jail that result in unconstitutional punishment by (1) denying him exercise, (2) only providing one uniform that is laundered twice a week, and (3) preventing him from getting sufficient sleep.

The Constitution "prohibits the imposition of conditions of confinement on pretrial detainees that constitute 'punishment.'" *Hamilton v. Lyons*, 74 F.3d 99, 103 (5th Cir. 1996) (quoting *Bell*, 441 U.S. at 535). Where the challenged "restriction or condition is not reasonably related" "to a legitimate governmental objective," courts "may infer" a punitive purpose. *Bell*, 441 U.S. at 539. Nevertheless, *de minimis* restrictions do not amount to punishment, no matter a defendant's intent. *See id.* at 539 & n.21 (defining "punishment" to include "arbitrary or purposeless" action but noting that there is "a *de minimis* level of imposition with which the Constitution is not concerned"); *Hamilton*, 74 F.3d at 106 (affirming dismissal of detainee's conditions of confinement claim, where he was subjected to a "*de minimis* level of imposition" such that the conditions did not amount to punishment). To establish a viable conditions of confinement claim, a detainee must demonstrate: "(1) 'a rule or restriction or . . . the existence of an identifiable intended condition or practice . . . or that the jail official's acts or omissions were sufficiently extended or pervasive'; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of [the detainee's] constitutional

rights." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 727 (5th Cir. 2020) (brackets, internal quotation marks, and citation omitted).

### a. Exercise and Clothing

Welsh avers that Deputy Weston, Administrator Diaz, and Sheriff Maddox have created unconstitutional conditions of confinement, and that Lamb County maintains policies, that prevent him from exercising by only allowing three hours of exercise and providing insufficient equipment and only one uniform that is laundered twice a week.

Welsh contends that "Lamb County denies all recreation equipment except a small rubber ball and [only] allow[s] 3 hours of recreation each week with no direct sunlight." Compl. 4. According to Welsh, this "policy is an exaggerated response to security concerns" and is implemented with "an intent to punish," as illustrated by the TDCJ's apparently more relaxed policies. Questionnaire 5. Similarly, Welsh alleges that Lamb County's policy of only providing one uniform that is laundered twice a week prevents him from "working out a sweat." Compl. 5. He contends this violates his rights by "deter[ring] exercise therefore punishing [Welsh]." Questionnaire 6. Welsh also appears to assert these claims against Deputy Weston, Administrator Diaz, and Sheriff Maddox in their individual capacities for "impos[ing] policies and regulations" that deny him exercise, such as the uniform and recreation policies. Compl. 4–5, 24.

No constitutional right exists for a particular quantity of recreation time. *See Smith v. Cockrell*, No. 2:02-CV-0305, 2003 WL 22076476, at *3 (N.D. Tex. May 1, 2003) (dismissing as frivolous plaintiff's claim that "he has a right to a certain amount of 'dayroom recreation time'"); *see also White v. Simpson*, No. 3-04-CV-0728-D, 2004 WL 2049306, at *4 (N.D. Tex. Sept. 13, 2004) (finding no constitutional violation where plaintiff "was denied access to the recreation yard" during the first six weeks of his incarceration and thereafter "received only 15 to 30 minutes

of recreation per day instead of two hours as mandated by TDCJ policy"). Because Welsh does not have a right to a certain amount of recreation or exercise time, the undersigned recommends the district judge dismiss his claim related to the three-hours per week exercise policy against Lamb County, Sheriff Maddox, Deputy Weston, and Administrator Diaz.

"[A]dequate clothing is one of the necessities of life of which . . . officials cannot deprive an inmate." *Gallegos v. McCubbins*, No. 18-4925 C/W 18-8752, 2018 WL 7050581, at *9 (E.D. La. Dec. 10, 2018) (quoting *Knop v. Johnson*, 667 F. Supp. 467, 475 (W.D. Mich. 1987)), *R. & R. adopted by* 2019 WL 220202 (E.D. La. Jan. 16, 2019). Welsh, however, does not allege that he was denied clothing—he merely takes issue with only being provided one uniform that is laundered twice a week because he sweats when he exercises. Such assertions do not raise a constitutional violation. *See Bates v. Pearl River Cnty.*, No. 1:21-cv-00408-BWR, 2022 WL 16701122, at *2 (S.D. Miss. Nov. 3, 2022) (finding plaintiff's claim regarding inadequate clothing without merit because although he was provided only one uniform, "he was afforded an opportunity to wash his clothing periodically, and he [did] not allege[] a lack of protection from the elements"); *Inmates, Wash. Cnty. Jail v. England*, 516 F. Supp. 132, 142 (E.D. Tenn. 1980) (re-issuing clothing to inmates weekly did not amount to punishment of the pretrial detainees), *aff'd*, 659 F.2d 1081 (6th Cir. 1981). Therefore, the undersigned recommends dismissal of Welsh's claim that Lamb County's uniform policy results in inadequate clothing (as well as his claims against Sheriff Maddox, Deputy Weston, and Administrator Diaz) because it fails to state a constitutional violation.

### b.  *Lack of Sleep*

Welsh asserts Lamb County has several policies, which in combination, deprive Welsh of sleep.

Welsh claims Lamb County has a policy of requiring Jail officers to "conduct visual checks every thirty minutes"—i.e., walking by with a clicker-counting device—which is "intended to prevent continuous sleep."[39] Compl. 15–16. According to Welsh, he has "a right to continuous sleep for at least 4 hours if not 6" under the Fourteenth Amendment. Questionnaire 18. Welsh asserts that under the Jail's rules, the lights are on from 10:00 p.m. to 4:00 a.m., the dayroom does not close until 11:00 p.m., and "[t]he noise level is constant" from 4:00 a.m. until 11:00 p.m. or 12:00 a.m. Compl. 16. The Jail also allegedly requires detainees to "clean the cell area between" 4:00 and 5:00 a.m., which in combination with the light policy, "has a mutually enforcing effect . . . to deny sleep." *Id.* He asserts that these policies allow him to receive no "more than 30 min[utes] of sleep at one time without being woken." Questionnaire 18.

"The Fifth Circuit counts sleep as one of life's basic needs and has held that conditions designed to prevent sleep . . . , *might* violate the" Constitution. *Murray v. Akal*, No. 6:20-CV-00792, 2021 WL 1325136, at *3 (W.D. La. Mar. 17, 2021) (citing *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999)), *R. & R. adopted by* 2021 WL 1323048 (W.D. La. Apr. 8, 2021).

In sum, Welsh claims that through existing Jail policies, he is prevented from sleeping for more than thirty minutes at a time. These alleged conditions, which persisted for approximately a year-and-a-half while Welsh was detained, state a plausible due process claim. While Welsh seems to acknowledge that unidentified security interests drive these policies, he apparently disputes their

---

[39] The undersigned acknowledges that Welsh pleaded facts against Jailers Molina, Fultz, and Whitaker that are related to his ability to sleep; however, the time periods governing these claims are somewhat distinct (*compare* Compl. 16 (claiming that the Jail's policies prevented him from sleeping from September 2020 to March 2022), *with id.* at 18 (alleging that beginning on January 25, 2022, Jailers would intentionally make noise to wake Welsh)), and Welsh designated the facts underlying these claims under separate causes of actions on the "Counts" page of his Complaint. *See id.* at 26 (asserting one claim as a conditions of confinement claim and the other as a harassment claim). Because Welsh: (1) explicitly contends these conditions result from Lamb County or the Jail's policies and does not identify any individuals responsible for enforcing these conditions; (2) bases his claims against Jailers on specific episodic acts and omissions rather than conditions or policies; and (3) avers Jailers harassed him during a different time period, the undersigned understands Welsh to only be alleging his claims related to the lights, noise, etc. as a policy claim against Lamb County. *See id.* at 15–17, 26.

necessity for obtaining legitimate penological ends, in part by contending that these policies are implemented with an intent to punish detainees. *See* Compl. 15 (alleging conditions "are intended to prevent continuous sleep"), 17 (complaining that the Jail "has the same security issues with the lights down as with the lights on and there is no significant reason why the lights cannot be lowered"). Without first requiring Jail officials to provide the reasoning behind the complained-of conditions, the undersigned cannot determine whether they are reasonably related to legitimate penological interests. *See Marts v. Randolf*, No. 94-30514, 1995 WL 10520, at *2 (5th Cir. Jan. 3, 1995) (per curiam) (holding it was an abuse of discretion to dismiss plaintiff's claim that he was constantly denied a mattress because it arguably amounted to punishment and defendants were never served, so nothing in the record provided a legitimate rationale behind the actions); *Palmer v. Jefferson*, No. 3:22-CV-508-DPJ-FKB, 2023 WL 6881814, at *9 (S.D. Miss. Oct. 18, 2023) (finding that pretrial detainee stated a constitutional violation based on the de facto policy, and that while the defendant "may have [had] a defense to th[e] claim, . . . at the pleading stage" it could not be dismissed); *Kratzchmar v. Holcomb*, No. 3:20-CV-360-DRL-MGG, 2020 WL 5594542, at *1 (N.D. Ind. Sept. 18, 2020) (ordering defendants to answer because plaintiff alleged facts showing conditions amounting to punishment and was entitled to favorable inferences at screening stage).

Welsh appears to assert these conditions result from Lamb County policies but he does not make clear whether these are written policies or based on a pervasive practice. *See* Compl. 16 (contending Lamb County generally has a policy). An official policy can be shown by: (1) "a policy that is 'officially adopted and promulgated' by the municipality or by" a policymaker; (2) a "'persistent, widespread practice of city officials or employees . . . so common and well settled as to constitute a custom that fairly represents municipal policy'"; or (3) in rare circumstances, "a

'single decision by a policy maker.'" *Mitchell v. City of New Orleans*, 184 F. Supp. 3d 360, 371 (E.D. La. 2016) (citations omitted). Welsh alleges that while detained from September 15, 2020, until March 4, 2022, it was Jail policy to require visual checks, cleaning at certain times, that the lights remain on, and dayroom be open during most hours. *See* Compl. 16; Questionnaire 18.

Liberally construing his allegations, he has shown a pervasive practice sufficient to constitute official policy based on his assertions that these conditions persisted every night throughout his year-and-a-half detainment at the Jail. *See* Compl. 16; *Burns v. Goodman*, No. 3:99CV0313-L, 2001 WL 498231, at *5 (N.D. Tex. May 8, 2001) (concluding plaintiff's allegations that during night shift, jail employees generally observed prisoners while "dressing out" created a genuine issue of material fact as to whether there was a pervasive or widespread practice), *aff'd*, 31 F. App'x 835 (5th Cir. 2002); *Mayberry v. Pulley*, No. 3:23-CV-1023-TLS-APR, 2024 WL 1435406, at *2 (N.D. Ind. Apr. 2, 2024) ("[Plaintiff's] allegation that the nutritionally inadequate and rotten meals were frequently served over a several-month period is sufficient to create a reasonable inference that [defendant] ha[d] a 'widespread practice.'"). Thus, Welsh has successfully identified an official policy or custom and "a constitutional violation whose 'moving force' is that policy (or custom)." *Pineda*, 291 F.3d 325 at 328.

Welsh has also satisfied the policymaker element by identifying Sheriff Maddox as Lamb County's official policymaker. *See* Compl. 1; *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) ("Under Texas law, sheriffs are 'final policymakers' in the area of law enforcement for the purposes of holding a county liable under § 1983." (citation omitted)). Welsh, however, has failed to aver Sheriff Maddox had actual or constructive knowledge of the policies or the continuing, complained-of conditions. Thus, he has not established the necessary link between policy maker and the alleged unconstitutional policy—he alleges no facts showing that Sheriff Maddox was

71

aware employees were conducting visual checks every thirty minutes or leaving the lights on, etc., such that Welsh and other detainees could not sleep, much less that Sheriff Maddox approved of or ratified these practices. *See* Compl. 16–18 (failing to mention Sheriff Maddox once in connection with his sleep deprivation claims); Questionnaire 19 (alleging only that Sheriff Maddox was aware of Jailers' *harassment or retaliation* (discussed *supra* Section II.C.3.) against Welsh, i.e., slamming the window shut and giving Welsh cold meals, and allowing it to continue, rather than knowledge and ratification of light, dayroom, and cleaning policies that purportedly deprive him of sleep).[40]

Because Welsh has failed to "plead facts that sufficiently connect the policymaker to the allegedly unconstitutional policy," the undersigned recommends the district judge dismiss Welsh's sleep deprivation claims against Lamb County. *Williams v. Johnson Cnty.*, No. 3:21-cv-1612-L-BN, 2022 WL 2836803, at *5 (N.D. Tex. May 31, 2022) (explaining that while plaintiff may have plausibly alleged a pervasive practice at the jail, plaintiff "fail[ed] to allege facts from which the [c]ourt [could] infer that [the county's] sheriff was aware of his treatment at the jail" or "ratified the misconduct"), *R. & R. adopted by* 2022 WL 2835838 (N.D. Tex. July 20, 2022); *see Burns*, 2001 WL 498231, at *6 ("Setting the bar too low—that is, inferring constructive knowledge simply because of a widespread practice—risks collapsing the standard of municipal liability established by *Monell* . . . ." (footnote omitted)); *Singleton v. Champagne*, No. 17-17423, 2019 WL 917728, at *4 (E.D. La. Feb. 25, 2019) (dismissing *Monell* claims in part because "[p]laintiffs d[id] not allege that the [s]heriff had actual or constructive knowledge of any alleged practices or customs that allegedly violated [p]laintiffs' constitutional rights").

---

[40] For the reasons discussed *supra* note 39, Welsh's claims against Jailers are construed as separate from his sleep deprivation policy claims and thus, Sheriff Maddox's knowledge of Jailers' purported harassment does not operate to give him actual or constructive knowledge of the complained-of policies.

Therefore, the undersigned recommends the district judge dismiss Welsh's claim related to alleged policies causing him to lose sleep against Lamb County. Alternatively, should Welsh seek leave to amend or supplement his claim in the fourteen-day objection period, pleading facts that show Sheriff Maddox's actual or constructive knowledge of these conditions, the undersigned recommends the district judge order Lamb County to answer or otherwise plead to such claim.

### III.    Recommendation

For these reasons, the undersigned recommends that the United States District Judge dismiss with prejudice Welsh's claims related to:    (1) Lamb County, Deputy Weston, Administrator Diaz, and Sheriff Maddox under the Fourteenth Amendment for preventing Welsh from exercising; (2) Deputy Garza under the Fourteenth Amendment for forcing Welsh to sign a disciplinary hearing waiver form and denying him his right to notice of the factual allegations against him and a hearing; (3) Administrator Diaz under the Fourteenth Amendment for confiscating commissary items purchased before his commissary restriction began; (4) Lamb County under the First and Fourteenth Amendments for denying him internet access so that he could express his opinion in the Texas Supreme Court election; (5) Lamb County and Sheriff Maddox under the First and Fourteenth Amendments for switching the cable system and denying him radio access and video games; (6) Lamb County and Sheriff Maddox under the Fourteenth Amendment and Texas Constitution for promulgating rules and punishing Welsh without legislative or judicial authority; (7) Lamb County, Sterling Corporation, and Prodigy Services under the Sherman Act for conspiring to inflate commissary and phone rate prices; (8) Lamb County, Administrator Diaz, Deputy Armstrong, Sheriff Maddox, Deputy Klatt, and Deputy Cotton under the Fourteenth Amendment for denying him his right to refuse medical treatment and using excessive force; (9) Jailers Whitaker, Molina, and Fultz under the First and Fourteenth

Amendments for retaliating against Welsh for filing grievances against Whitaker; (10) Lamb County, Sheriff Maddox, and Administrator Diaz under the Fourteenth Amendment for denying Welsh access to his KIOSK mail and the opportunity to show his entitlement to his mail; (11) Deputies Weston and Thompson under the Fourteenth Amendment for excessive use of force; (12) Jailer Martinez and MTC employees Winckler and Powell under the Fourteenth Amendment for failure to intervene during the use of force; (13) Deputy Weston, Deputy Thompson, Deputy Klatt, Deputy Cotton, Deputy Armstrong, Jailer Martinez, Sheriff Maddox, MTC Employee Winckler, MTC Employee Powell, Lamb County, and Administrator Diaz under the Fourteenth Amendment for denying Welsh his liberty interest in not having restraints used on him; (14) Administrator Diaz and Sheriff Maddox under the Fourteenth Amendment for denying Welsh mental health treatment; (15) Lamb County, Administrator Diaz, and Sheriff Maddox under the First Amendment for denying Welsh the ability to order books and publications; (16) Lamb County for its "high" phone prices, which chills his First Amendment rights; and (17) Lamb County under the Fourteenth Amendment for maintaining a policy that resulted in denying Welsh due process after his newsletters were confiscated or rejected. Compl. 24–27.

The undersigned further recommends that the district judge dismiss Welsh's claim against Lamb County related to alleged conditions of confinement that deny Welsh sleep. Alternatively, should Welsh seek leave to amend or supplement his Complaint within the fourteen-day objection period with facts that satisfactorily address the deficiencies identified herein, the undersigned recommends the district judge order Lamb County to answer or otherwise plead to the claim.

As to the sole remaining claim against Sheriff Maddox and Administrator Diaz in their individual capacities under the Fourteenth Amendment for failing to notify and provide him with

process after confiscating his newsletters, the undersigned recommends that the United States District Judge order Defendants to answer or otherwise plead to the claim.

## IV.    **Right to Object**

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1) (2016); FED. R. CIV. P. 72(b).  To be specific, an objection must identify the specific finding, conclusion, or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: June 21, 2024.


**D. GORDON BRYANT, JR.**
**UNITED STATES MAGISTRATE JUDGE**